IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

MATTHEW E. POESE

## SENTENCING MEMORANDUM

AND NOW, comes the Defendant, Matthew E. Poese, by and through his counsel, Stephen E. Sebald, Esq., and submits this Sentencing Memorandum in support of a sentence of one day in prison, a significant period of home detention with electronic monitoring and work release, and five years of supervised release with conditions. This sentence reflects the nature and circumstances of Mr. Poese's offense and his history and characteristics, and is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).

## I.  Nature and Circumstances of Mr. Poese's Offense and His History and Characteristics

This case stems from the arrest of Defendant for his possession of a single image of child pornography. This followed from a complaint by Microsoft to law enforcement agents stating that on January 15, 2019, a user with a specified IP address had viewed a file on Bing Image which Microsoft believed to be child pornography. The image depicted a nude prepubescent female standing in a modeling pose exposing her breasts and vaginal area. It depicted no sexual activity, violence, bestiality. Authorities traced the IP address to Defendant, obtained a search warrant, and subsequently arrested him.

Mr. Poese is 48 years old. He has no criminal history, and has complied with all conditions of pre-trial release over the past several months, including being on house arrest since August 10, 2019. Mr. Poese is deeply ashamed and remorseful for his actions. Since his arrest, Mr. Poese has been consistently and willingly seeing a psychologist who has been helping him understand his addiction to work and use of pornography and masturbation to deal with work-related stress and insomnia. Further, he has acknowledged personal responsibility for his offending behavior, no longer engages in that behavior, has improved his understanding of how sexual abuse and pornography negatively impacts victims, and made progress towards achieving healthy social supports and relapse prevention.

Defendant has no depression or other mental health issues. That said, previous to his arrest, he had been under a great deal of stress, having, for the previous five years, working seven days a week, very long hours, with mounting guilt that he was paying insufficient attention to his family and house. As the top administrator as his organization, his professional duties occupied an inordinate amount of his time, leaving little time for his family.

Additionally, on October 29, 2018 a best friend and father figure who had worked at Camp Fitch for the entirety of Defendant's 30 years of association with the organization died unexpectedly of a heart attack. This added to Mr. Poese's stress level as he not only was personally grieving but was providing support for many of his Camp colleagues distraught over the untimely and tragic death. This contributed to the long list of expectations that he felt others had for him, exacerbating his stress-related insomnia.

He was kept up at night by the stress; masturbating at night would help him to get back to sleep. Almost exclusively he used legally obtained pornography with adult subjects but his curiosity got the best of him and following "suggested" search terms led him to a previously

unknown corner of the web with one photo that turned out to be illegal. While he takes responsibility for his misconduct, he also asserts that if he would have understood how dangerous these searches could be, he never would have utilized search queries to look for pornography different than the adult, legal images he had previously accessed.

## II.     Defendant's Background

### A.     Education and Employment Background

Following his graduation from high school, where he was one of the top three scholars, he attended University of Cincinnati, graduating with honors in Mechanical Engineering, and then attended graduate studies at Penn State University culminating in a Ph.D. He then served as a professor at Penn State University, where, among other responsibilities, he volunteered to advise several graduate students -- both Masters' and Ph.D. students -- a volunteer effort as this was not part of his employment expectations as a research faculty member.

Mr. Poese collaborated with other professors and acted as Principal Investigator at Penn State University, to lead funded research efforts (from the Navy, Marine Corp, and private industry), culminating in stellar professional accomplishments: four patents, five journal publications, and 22 conference presentations, and advising to completion several Masters' Degree students and two Ph.D. students. Most of the research effort was dedicated to development of an acoustical refrigeration technology that could provide cooling without using chemical refrigerants like CFC that destroy the Earth's protective ozone layer or HFC which are potent global-warming gases. See letter by Steve Garrett, attached. As attested to by Professor Garrett, Matt Poese's academic research was propelled not simply by personal ambition but, like his tireless and unpaid work for Camp Fitch, as a means to better the world.

His work at Penn State University extended beyond the college classroom, taking his passion for STEM topics to the campers at his beloved Camp. He was able to do this because of an unusual arrangement with Penn State that permitted him to spend summers at the Camp rather than in the lab as expected of most graduate students and professors, an arrangement that was allowed because of the significant contributions to the University.

While still employed full-time at Penn State University, he performed a significant amount of volunteer work at Camp Fitch. As a volunteer he started a fundraiser (The Polar Bear Plunge) that now raises $200,000 annually providing access to Fitch to children whose families cannot afford the fees. See Letter by Don Sniderman, Board Member Camp Fitch, attached. In addition, he volunteered all of his vacation time from Penn State (five weeks per year) to Camp Fitch managing projects with his engineering skills, building program areas, coaching staff, life-guarding on the beach, and performing other necessary tasks. Moreover, as a volunteer, he was a major force in organizing several events, such as the annual Family Camp and its Centennial Celebration.

Additionally, while teaching at Penn State, our country was attacked on September 11th. Defendant and some of his fellow engineers contacted authorities in New York City and volunteered to use their acoustical technology to help find survivors. He and his fellow engineers packed up their equipment and headed into the fire, smoke, and toxic environment. See letter from Scott Osborne, attached.

For the past five years, he has worked for the YMCA Camp Fitch full time. He took a significant pay cut to join the staff at Camp Fitch YMCA; moreover, he was not paid for any of the overtime that he worked. Consequently, much of past five years of his employment there essentially was in a volunteer capacity. He also helped start the Alumni Work Weekend, which is

a group of former staff that volunteer their time to help improve Camp Fitch. See Letter by Heather Bauman, attached. He improved the water treatment system, software systems, along with designed the new camper cabins and began redesigning the Master Site plan and front entrance, among many other projects. Letter by Jessie Downie, attached. Further, he presented and began accomplishing a five-year plan to improve all services from spearheading the new Equestrian Center, to designing and constructing 12 new camper cabins with restrooms, to planning a state-of-the-art invention center called the "Maker Center", building a handmade 8ft. telescope, along with re-engineering all utilities and making camp handicap accessible and thus compliant with all state regulations and standards. See letter from Joe Kohut.

He researched and implemented several software platforms that have streamlined work across all of the Camp's departments, he oversaw the design of a master site plan to help guide Camp Fitch in its next chapter of growth, he negotiated with the YMCA association to raise salaries for everyone (but himself) to a livable wage, he redesigned the Camp Fitch website and marketing materials to better narrate the treasures of friendship, achievement, and belonging that a Fitch experience provides to campers. See letter from Kelly Poese, Director of Programs, Camp Fitch, see attached; letter from Ken Barton. These enhancements grew the Camp's summer enrollment numbers from 80% to 100% full and in turn, increased Camp Fitch's total revenue by 50%. This renaissance at Fitch is the most growth in an equivalent time frame that it has ever experienced -- all driven by Matt's desire to innovate and commitment to execute. See letter from Kelly Poese, Director of Programs, Camp Fitch, see attached. He led major enhancements to the water treatment system, creation of the "hobby farm", and a major dredging and dam repair operation to an inland lake, serving as project manager to apply for permits, acquire needed materials, hire builders, widen camp paths and roads. Id. See also letter from Craig

Sheetz, CFO (noting that the Camp increased its attendance from 80% to 100% because of Matt Poese). Finally, he was the mastermind behind creating memorable Centennial Celebrations. Letter from Emily Heyl.

His tireless work at Camp Fitch included making the facility safer for children. For example, he implemented a variety of strategies to increase child protection. He oversaw the transition the state of Pennsylvania made to require clearances for all employees and volunteers. He pushed the organization to adopt a software package that helped employees and volunteers submit those clearances and access them during employment. He masterminded a cabin design process that doubled the amount of adult supervision for campers and provided private changing areas and en suite private bathrooms to minimize risk. He implemented a self-reporting system for staff and volunteers to disclose moments when circumstances forced them to violate the Camp's foundational rules about child safety (being alone with a child, touching a camper without their consent, etc.) He visioned an entirely new supervision model that reduced opportunities for abuse and bullying. Letter from Kelly Poese, Director of Programs, Camp Fitch.

In sum, his professional career has been marked by accomplishments, energy, passion for Camp Fitch, incredible hard work, and a vision coupled with a can-do attitude. All these amazing characteristics made him utterly beloved to his colleagues and friends and family.

## B. Family and Community Status

Defendant has a wife to whom he has been married 20 years, and two daughters, age 11 and 15. Despite his wrongdoing, his wife, children and extended family still stand by him and support him as he moves forward in a law-abiding manner. In fact, he has collected over 150 letters of support, demonstrating the valuable contributions he has made to his community, the

trust others have in him, and the high regard which he enjoys – and continues to enjoy --
amongst his family members and peers.

Mr. Poese's wife and daughters will appear in court to support him at sentencing. They
believe that this behavior was out of character and that he will never become involved in
possessing child pornography again.

He is an equal partner to his wife in the care and education of their two daughters (ages
11 and 15). He has been active in their lives, helping them with homework, using his engineering
background to help build school projects, and, prior to his home arrest, transporting them to their
many after-school activities. In addition, his parents are in their 80's and live only one hour
away. In fact, one of the reasons Defendant and his family moved to the Erie area from State
College was to enable him to help care for them as their aging diminishes their independence.
In addition, he is integrally involved in the maintenance and care of the family's residence as
well as their rental property in State College.

## C. Community Support

Defendant is well regarded amongst his family, peers, neighbors, and associates. Despite
his misconduct and arrest, those in his community continue to support him and view him as an
upstanding citizen, a valuable community member, an inspiring mentor, and a generous and
ethical human being. The following represent a snapshot of some of the sentiments shared by
those who know him:

- Abby Hazi, Nurse Practitioner: She lived with Defendant and his wife for a period
  of time and sees them as her parents-away-from-home
- Adam Bonner, Manager at Amazon: describing Defendant as a "strong,
  responsible role model" who "continues to have a profound, positive impact in
  my life." Defendant is a "shining example of servant leadership."
- Al Leonhart, Engineer: Defendant's "compassion for [Camp Fitch YMCA Camp],
  its staff, campers, and the mission of the YMCA is undying."

- Alan Begy, Financial Planner: "Matthew has faced this problem in a very direct manner and has not chosen to hide from his mistake."
- Allen Family, campers at Camp Fitch YMCA: "He has been banned from Camp Fitch, which very well may be the worst punishment of his life."
- Amy Mirkin, Accounting Director: "Incarceration would not serve to punish him anymore than what he is already experiencing."
- Amy Pettigrew, retired Academic Advisor: "he already holds himself accountable and knows he made terrible decisions."
- Anna Buhl, 6th Grader: "I cannot imagine Matt in jail, or what it would do to his family. All I know is that it would be terrible."
- Barb Hyde, Retired Teacher: Defendant is a "man with exemplary character."
- Barb Olin, Retired Outdoor Education Director: She emphasized the "essential part" he plays ins his daughters' lives
- Barb Roman, Development Board Camp Fitch YMCA: Defendant "is the quintessential example of dedicating your life to a great cause, Camp Fitch."
- Beau Sniderman, Photographer: "his incarceration [would] only take away the next inevitable project that is sure to benefit a great many individuals."
- Ben Pratt, Economic Development Manager: "I consider Mat Poese to be one of my greatest friends and mentors."
- Bill Hettler, Retired Physician: "Matt has done more good in developing Camp Fitch facilities and program [sic] than any other leader during my lifetime."
- Bob Osborne, Retired Teacher: "his love for his family and the Camp Fitch family have been above reproach."
- Bob Zajack, Retired Membership Director, YMCA: "With all the negative publicity set forth about Matthew, he still has the support, trust, and respect of so many people that I come in contact with."
- Bonnie and Gary Bonner, Retired Accountant and Financial Consultant: "We felt so blessed to have this outstanding man and his family helping to shape our son into the incredible young man he is today."
- Brad Barton, Manager: "By considering probation in this case, his daughters benefit by having their father remain an active presence in their lives, his family benefits by having him remain a part of the fabric, and society benefits from whatever Matt Poese's next chapter is unveiled to be."
- Brandy Duda, Outdoor Education Director: "Losing Camp forever is the worst punishment Matt will ever have. . . . His mission, his core, his center of balance has been removed or severed for life. I can think of no greater punishment for Matt."
- Brandy Prebble, Director of Special Education: Defendant is "a caring father and husband, a respected community member and a committed and hard-working man."
- Brian Downie, Project Manager: "He is one of the hardest working people I know."
- Brian Stark, Physician: Defendant is a "decent, honest and thoughtful person" who is a "fantastic role model to children and adults alike . . ." and as his personal physician, he has "no evidence of pedophilia or any other sexual or behavioral aberrancy or disorder."

- Chance Orton, Summer Camp Director: regarding Camp Fitch's growth, "It would not have been possible without Matt Poese's work ethic or drive."
- Charles Buhl, Maintenance Team, Camp Fitch: Defendant is "very trustworthy [and] caring"
- Cheryl McDonald, Sales Manager: "His hard work and commitment to ensuring an amazing, life-enhancing experience for each and every child at Camp Fitch has been instrumental to the success they have experienced"
- Chris Green, Financial Advisor: "He has always been someone who has given selflessly and conducted himself in an admirable manner"
- Chuck Buhl, Logistics Specialist: "Separating Matthew from his family at this time will only hurt them further, being such a crucial time for his daughters, [at] an age when they need a father"
- Cindy Dingeldein, Architect: "I believe that he has true remorse"
- Craig Sheetz, CFO: "There is no one that cares more for Camp than Matt Poese"
- Dann Olin, Assistant Director Camp Fitch: "He has made me a better father, husband, son, brother and man"
- Dave Mehler, National Account Executive: "My feelings about Matt's character are such that I connected him with an engineering opportunity at a local company where I know top management because I now he could bring value to them"
- Dave Webster, Criminal Attorney and former prosecutor: "I am confident, based on my discussions, that Matt understands the illegality of his actions, is remorseful, and will not put himself, or his family, in this situation again."
- David Parker, Systems Caretaker, Camp Fitch: Defendant is "an honorable individual . . . and a great human being"
- David Sheetz, Assistant Manager: "The joy that Matt has brought to everyone is immeasurable. I know that he will continue to influence peoples' lives in meaningful ways."
- Diana Moore, Ph.D. Psychology: "In 8 summers working at Camp Fitch, I never once observed Matt to engage in inappropriate behavior. If I had, I wouldn't be writing this letter. I take criminal activity, specifically sex offenses, very seriously. I do not believe that Matt having an image of a child was motivated by sexual interest in children."
- Don Moffa, Director of Education: "I have only known Matt to be a generous, helpful, ambitious, selfless, kind, thoughtful, and talented leader."
- Don Sniderman, Board Member Camp Fitch: "The Camp Fitch Polar Bear Plunge. . . Created by Matt as a fundraiser, it has grown every year in popularity and money raised. Donations topped $200,000 dollars this year. The money is used to create scholarships for disadvantaged kids who could not otherwise afford camp.
- Barb and Greg Donahue, Retired Assistant Directors, Camp Fitch: "The worst punishment for his deeds has already happened."
- Donna Seiser, Director of Technology: "I just cannot list all of the amazing contributions that Matthew Poese has made to Camp Fitch"
- Drew Mortensen, Assistant Principal: "Nothing about his arrest or the charges fit with the person whom I have known. In five years time, not a single red flag has

ever been raised in my mind --- and I am trained to look for, and be cognizant of, the signs of those that aim to prey on children."

- Emily Heyl, Outpatient Therapist: "I can only hope you see the major impact that Matthew Poese has had on so many lives, including my own."
- Eric Hutchinson, Singer Songwriter: "Matthew Poese has been an amazing example to me of a great father."
- Fritz Poese, Retired Physics Teacher: In his life before this, he has never had a speeding ticket or a traffic ticket. He is really a good man.
- Fred Solomon, Building Caretaker, Camp Fitch: "He has put the welfare of the people in his care at the forefront of his thinking."
- Gina Green, Occupational Therapist: "I wanted to provide an opportunity for those children to experience the richness of Camp Fitch. Matt became the mastermind behind this new partnership with The Bridge Avenue School. The Camp Fitch experience was lifechanging for the children and the staff. That happened because of Matt's strong leadership and desire to do better."
- Gretchen Hanson, Program Recruitment: "He deeply regrets the actions that led to the charge. He owns that he has made mistakes and now needs to atone for them."
- Gwen Spitz, Retired Teacher: "Matt is also one of the most loving and devoted husbands, fathers, and sons-in-law I know."
- Hannah DeAscentis, Recreation Coordinator: "Without this love and guidance from Matt, I would not have been able to succeed in one of my proudest professional accomplishments. Matt has always been a caring and supportive role model and mentor for me."
- Hannah Kight, Officer Manager Camp Fitch: "my trust in his character remains steadfast."
- Heather Bauman, Diabetes Care Specialist: "Matthew's priority has always been children's safety, and this was fully demonstrated over the past five years that he was the executive director of Camp Fitch."
- Holly Knox, Recreation Program Manager: "I pray every day that all those associated with Matt's case will see him for the man he is – a caring father and husband; a man who has dedicated his life to providing outstanding experiences and personal growth opportunities to campers and staff at Camp Fitch; a visionary who has researched and implemented projects that used his imagination and intellect to better Penn State and camp; and a volunteer who translates his passion into inspiration for others to make a positive difference."
- Howdy Friend, Development Board President Camp Fitch: "Our decision to terminate Matt from his Executive Camp Director position was difficult for all involved and I feel was a huge punishment."
- Jay Humphrey, Chief Counterdrug Operations: "I would not be the man I am today if I had not met Matt Poese in 1990 at Camp Fitch."
- Ira Mirkin, Attorney: "Matt Poese is a genuinely good person."
- Jack and Janet Mayberry, School Administrator and Teacher: "Matt is a wonderful person."
- James Moelk, Creative Director: "He is dedicated and selfless and his primary goal in life has been to give back to others."

- Jimmy Perkins, Penn State student: "I am a young professional now, an engineering student at the very university where Matt was once a professor, and I can say with absolute certainty that I would not be where I am now without the care, inspiration, and compatriotship of Matt, all of it freely given with the selflessness of a father."
- Jamie Kidd, Operations Manager: "I do not think Matthew is a danger to society. I believe that Matthew will use this situation to ultimately contribute to the betterment of others and to society, as he has already spent many years doing."
- Jason Barressi, Chief Information Officer: "He is the man who puts others before himself, who has made great sacrifices in the interests of bettering society as a whole. A man who knows no other life than a life in service to those in need."
- Jason Hyde, Hospital Director: "I know he has never used drugs, has been with the same woman since we were young adults, and has dedicated his entire life to doing good."
- Jason Roche, VP: "I know the value he brings to others and ability he has to do good in his community. I do not believe he poses any threat to his family, his community, and to others."
- J.D. Mirto, Metro Board President, YMCA: "He is truly a visionary and in the short time he was executive director he has made Camp Fitch a better place for all people."
- Jeff Altman, Retired: "One can not pick their closest family, but if I could pick a father, a brother or a son – I would pick him."
- Jeff Banks, Department Head: "He has been a positive role model to his daughters, to my family, and to our community."
- Jeff Daigle, Engineer: "he has watched out for and ensured the safety and well-being of many many other adults and children in camp. I have never witnessed Matt acting inappropriately."
- Jeff Downie, Photographer: "Matt is and always has been so giving to anyone that needs help."
- Tim and Jenny Jamison, CPA: "All decisions that he made [at Camp Fitch] were focused around increasing child safety and making a difference in their lives."
- Jessica Flere, Spanish Teacher: "Matt is beloved by all of his friends and colleagues."
- Jessie Downie, Occupational Therapist: He improved the water treatment system, software systems, along with designed the new camper cabins and began redesigning the Master Site plan and front entrance, among many other projects. He spent his days as director ensuring the safety of the campers and staff."
- Jill Bream, Wardrobe Stylist: "When my husband and I were thinking about starting a family, we referenced Matthew and his wife Kelly all the time as examples of great parents and they became real inspirations of why I wanted to have children."
- Joe Amerson, Special Events Supervisor: "Everyone became better because of the foundation that Matt built."
- Joey Kohut, Program Analyst: "In all of my years of knowing Matt, I have never once questioned his character."

- Joe Kohut, Retired Director of Primary Care: "His overarching emphasis has always been evident by putting the safety of children and staff first with focus on providing a life changing, memorable, positive experience for all."
- Joe Wolnik, Summer Camp Program Director, "Matt has been a champion of this community. Sending him away would only cause greater harm than good."
- John DeLillo, President, Paving company: "The charges against Matt do not capture him as a whole: Matthew Poese is a kind and generous servant, who never gives up on an individual or his mission."
- Joy Osborne, Talent Acquisition: "I would describe Matthew as selfless."
- Judy Christine, Retired Teacher: "Matt has always demonstrated exemplary personal traits."
- Judy Sheetz, Family Camper: "Personally, my three children have all benefited from their association with Matt. He has served as a respected role model."
- Julie Altman, Retired Teacher: "I humbly ask you not to give jail time and further deprive him and his family from starting to heal from this tragic error in judgment"
- Kajsa Sniderman, Occupational Therapist: "It is unfathomable to think about a world where Matt is not using his whimsical brain to create a better world."
- Karen Poese, Retired teacher: "His life has always been a living example of good character and citizenship."
- Kasie Rooche, Mother: "I understand Matt made an unfortunate mistake. However, I do believe that he is the kind of person who would never hurt anyone."
- Kathy Siemon, Management: he has never placed "blame anywhere but on himself."
- Katie Ivey, Mother: "He truly wanted to continue to make camp the best place it could be for children, a second home where they could be comfortable, find themselves and form life-long friendships."
- Katie McDevitt, Project Manager: "I have always believed in his character and strength. I trust Matt and have always felt safe in his presence and have never for a moment felt or observed any behavior that was inappropriate or unprofessional."
- Kay Hettler, Retired Teacher: "I have never questioned Matthew's interactions with children, including the many times he has spent hours with my own five young grandchildren."
- Kelly Poese, Director of Programs, Camp Fitch: "Never in our 30 years together had I ever had suspicions or evidence by Matt of any form of power imbalance, sexual deviance, or hidden compulsions . . . I have supported Matt on every step of this journey and our family has remained fiercely intact."
- Ken Barton, Retired Teacher: "His time under house arrest has given him a chance to evaluate who he was, who he is and who he hopes to be. He is closer to Kelly, Susannah and Maddy than he perhaps has ever been. He needs them and they need him."
- Kevin Mackay, Neurology Department: "Matt has worked and dedicated his entire life as a leader in enriching youth development"

- Kilo Wong, Lecturer: "I sincerely believe imprisonment would not be beneficial but detrimental to the society as that would take a person who is able to do countless contributions away from where he should be doing."
- Kricket Downie, Mother: "I know this drive to make a more meaningful impact in camper lives and spending more time with his wife and children are what led Matt to make the change to work at Camp Fitch."
- Laura Cunningham, Mother: "I know at the core who Matt is and he is so much more than the one-time mistake he has made."
- Laura Eka, Director of Marketing: "He feels that anybody that hurts a child is the worst type of offender. However, he is not the man that these charges define. I think the hardest part in all of this other than hurting his family, is that he does not want people to think a single camper of Camp Fitch has ever been in an inappropriate situation with him or that he has never hurt a child and never will."
- Lauren Mack, Retreats Coordinator: "I will always recall the lessons of vulnerability, servant leadership, understanding, and hard work that Matt has taught me."
- Libby Cole, Athletic Trainer: "Before Matt became Camp Fitch's Executive Director he was a professor at Penn State University and would make the approximate 7 hour round trip drive to North Springfield every weekend, not just so that he could spend time with his family, but also to volunteer his time to help out with whatever was needing to be done around camp. His love for camp and his "camp family" is immensely evident on a daily basis and Matt always puts the needs of others before his own."
- Lindsay Forman, Teacher: "He is an incredibly valuable member of our community, and it will be unspeakably detrimental to us and to his family if he is to go to prison. His gifts – his care, his hard-working attitude, and his always problem-solving mind will be missed terribly."
- Lindsay Stewart, Graduate Student: "I am reminded of how blessed I am to have grown into an adult with Kelly and Matt as role models."
- Lisa Amerson, Manager: "I do not believe society would benefit from sending Matt to jail. Not being allowed to go back to the place he has dedicated almost his entire life to has been the worst punishment imaginable."
- Liz Dewar, Program Manager: "he has always been a thoughtful, trustworthy and loving person."
- Louise Osborne, Retired Teacher: Defendant is "admired for his talents and strengths of character"
- Lynlee Altman, President Construction Co: "I only know that the nature of the crimes is not consistent with the man that I have known for the majority of my life."
- Lynn Forman, Mother: "Matt has been an important adult to our daughters as they have grown from teens to adults. I have seen them learn from him, be challenged by him, be empowered by him to challenge themselves."
- Lynn Winans, VP: "I have never known Matt to not be fully responsible and accountable for himself and his choices."
- Maddy Poese, 6th grader: "My father is compassionate, caring, charming, funny, and all over a fantastic man."

- Maggy Tully, YMCA: "I believe that sending Matthew to jail would remove someone from our society who is willing to help anyone with anything, and that jail time would be detrimental to his family."
- Marina Parker, Art Teacher: "Matt is one of the smartest men I know, and he has much to offer the world. I know that he will continue to give back by sharing his insights and wisdom if given the chance."
- Marissa Cullen, Clinical Pharmacist: "Matthew is known as being steadfast in his commitment to his family and the community."
- Mary Ellen Kurtz, Business Accounts: "I know him to be an individual who puts his wife and children first, but extends his love and friendship to the entire family. He is honest and hardworking and is well respected among family members."
- Matt Friend, Account Manager: "Matt has also been proactive and transparent with his support system about his crime and accepts full responsibility."
- Michelle Marchetti and Ryan Jones, Editor: "Matt is a dedicated, hardworking, and devoted father and husband."
- Michele Davidson, Professor: "As a trained mental health professional with certification in forensics, my true opinion is that Matt has a very low risk for recidivism."
- Michelle Elias, Teacher: "I truly believe his actions were a single lapse of judgement."
- Mike Berty, Designer: "Given the chance for probation, Matt will no doubt throw himself wholeheartedly into making amends to his family, friends and community."
- Mike Dingeldein, Business Owner: "He sought to step immediately into atonement by taking responsibility for his actions without extenuation."
- Mike Seiser, Director: "It is very clear that Matt is extremely remorseful, recognizes his mistake, accepts full responsibility, and wants nothing more than to do everything he can to become a better person and continue to contribute to society."
- Molly Buhl, Equestrian Coordinator: "I have always trusted Matt through and through with my own flesh and blood, my only children, and I always will."
- Nancy Mirto, Family Camper: "He can be an asset to society."
- Nathan Hazi, Application Specialist: "My hope is that he may be afforded more opportunities to be a positive impact on the lives of others, just as he has been on mine."
- Noah Sniderman, Sales Director: "It is even more difficult for me to imagine Matt incarcerated given the invaluable service he has offered me and countless others."
- Nora Lamb, Independent Contractor: "I know that if Matt were to be spared prison time he would be able to use his time for the good. He has so much to offer the community."
- Pat Groner, Real Estate Broker: "Please extend the grace that keeps him out of toxic settings and instead keep him in loving surroundings that will allow him to heal from this event."
- Pete Heinze, Site Coordinator YMCA: "I feel that it won't be beneficial to send Matthew to jail. More importantly, he has daughters that are entering their teenage years, or already in, and need their father's loving advice and care."

- Rick Dearing, Company President: "I have personally witnessed how Matt works endlessly and effortlessly to solve problems, advance relationships, campaign for funds, and improve the quality of life for those he serves."
- Rob Hettler, Director of Applied Development: "I never once hesitated to have my kids around Matt and his family."
- Robert Lawrence, Program Facilitator YMCA: "Matt emulates everything that I strive to be as a leader."
- Ryan Knox, GIS Professional: "I am fortunate not only to witness Matt promote the importance of summer camp experiences and the mental, spiritual and physical well-being of youth, but to see the continued results of his efforts embodied in the growth of our two daughters."
- Sam Boak, Company Owner: "In speaking with his family, I know that they stand beside him, and so do I. I would be more than willing to employ Matthew at my construction business, Boak & Sons, Inc., in Youngstown, Ohio. My company is made up of over 150 union tradesmen who would benefit immensely from Matthew's brilliant leadership. I am confident that he would be an absolute asset to this business and I would be honored for him to represent my company name."
- Sam Miller, Company VP: "Please consider an appropriate method of treatment for Matt's past actions."
- Sara DeAscentis, Mother: "He is a person with so much to offer who is devoted to making the world a better place."
- Sarah Friend, Territory Manager: "Matt has always been someone I respect, and I STILL consider him a role model due to his character, integrity and work ethic."
- Scott and Sue Friend, Retired Account Manager: "I have personally witnessed the good Matt Poese has done for kids."
- Scott Mirkin, Gym Manager: "Matthew has always been the person at Camp that embodies all of the values we learned as campers."
- Scott Osborne, Insurance Agent: "While teaching at Penn State our country was attacked . . . . Being a person who has been helpful to others, Matt and some of his fellow engineers contacted authorities in NYC. They volunteered to use their acoustical technology to help find survivors. He and his fellow engineers packed up their equipment and headed into the fire, smoke, and toxic environment. They didn't do this for money, or fame, or notoriety."
- Debra and Mark Scoular, Staff at YMCA: "we would ask that you would consider leniency with Matt."
- Steve DelCalzo, Retired Teacher: "Throughout his years at camp, Matt was an outstanding role model He truly lived the YMCA code of being clean in mind, body, and spirit."
- Steve Drake, Financial Services: "I do not believe that a custodial sentence should play a role in righting that wrong. Matt has already faced the end of his employment with Camp Fitch, he has spent a significant amount of time restricted to his home and he is certain to face additional future consequences both direct and indirect from his actions whether or not he spends any time in prison. I do not see how society benefits from putting Matt in prison as compared to a non-custodial sentence that ensures he complies with appropriate conditions while still allowing his family to remain intact."

- Steve Forman, Addiction Psychiatrist: While Matt has accepted his guilt, responsibility and consequences for his offense, I do not see him as a threat to anyone – child or adult. Why is my threat assessment worth mention? I am a full-time addiction psychiatrist at the Pittsburgh VA for the past 25 years. I've had to make many threat assessments. While I haven't formally examined Matt, we've spoken since the arrest. Knowing what I know now, if I were to go back in time, I still would send my daughters to Camp Fitch – led by Matt and Kelly."
- Steve Garrett, Professor: "During his time at Penn State there were zero complaints about his behavior or comportment."
- Sue Barton, Shop Owner/Artist: "The shame, guilt, and public humiliation he has suffered since June 18th will last his lifetime. Matt is a dedicated public servant. He asks for so little and gives so much to kids, families, and staff who have little but need much."
- Sue Kohut, Retired Teacher: "As he presented the ideas of the new "double cabins", some of us old-timers resisted the idea, because we loved the tradition of the cabins and the openness. However, Matt pointed out that the new "double cabins" were safer and allowed for more accountability of staff and campers. His primary concern was for the safety of the campers."
- Sue Mirto, Mother: "Your Honor, as you consider the sentence for Matthew Poese, I would like you to realize that he has already been serving the worst punishment possible which is his banishment from any Camp Fitch property."
- Susannah Poese, 9th Grade: "My dad is my hero."
- Tara McAllister, Nurse: "Taking full responsibility for this crime should show you a glimpse of Matt's true character - I believe he is doing the right thing by admitting his transgressions and seeking penance from everyone in his life."
- Terry Fralic, Contractor, "While crime needs to have consequences, I believe Matt has already paid a higher price than the state could have imposed. Not being able to work at Camp Fitch (a truly devastating life sentence), the embarrassment this has caused his family and the camp, and the humiliation he caused himself."
- Tiffany Port, Housekeeping Team, YMCA: "My life is changed because of Matthew Poese."
- Tim Cole, Attorney and former prosecutor: "I wholeheartedly believe that justice would established through a strict and intense probation program focused on rehabilitation, rather than a punitive prison sentence."
- Tim Sheetz, Pilot: "The entire staff listened to and respected what he said because he always led by example and with moral clarity."
- Tina DiFiore, Certified Nurse Practitioner: "At staff meetings Matthew would often say that we are here for the children, but he not only said it he lived it."
- Todd Osborne, Business Consultant: "Matthew worked on the pile at ground zero [in NYC after 9/11] for more than a week before formal rescue operations were switched to recovery mode. Never did Matthew worry about the danger or potential long-term effects of exposure to toxic materials and substances amidst the rubble. The equipment was funded by Matthew and his team. Time was of the essence, and his only thought was to help with rescue of victims"
- Tom Cunningham, Company President: "he is one of the most authentic, caring, intelligent, upstanding and trustworthy people I know"

- Tom Parker, Executive Director Camp Fitch: "He is a servant leader who thrives when helping others."
- Tommy McCumber, Grounds Caretaker, YMCA: "The number of great things I have to say about Matt's character is nearly endless."
- Zac Sniderman, VP of Sales: "I don't believe that incarceration is the best option for Matt. Matt has had a powerfully positive impact on myself and those around him, and I believe that he can continue to have a positive impact on people's lives if given the opportunity."
- Anthony Palmieri, Attorney: "Matt Poese is one of the finest human beings I have ever known."

The summary of the many, many letters of support that Defendant has received? He is trusted by his friends and colleagues. They have never observed him act inappropriately. He is remorseful and open about his failings and committed to becoming a better person. He is supported by a huge network of individuals who wish to assist him as he moves forward. And his hardworking, passionate, visionary gifts will be lost if he is incarcerated.

## D. Defendant's offense and remorse

The evidence in this case demonstrates that Defendant was found with only a single illegal photo in his possession, which is consistent with his averment that he only used pornography for a short time – and never compulsively nor obsessively. The image he accessed, albeit illegal, depicted only nudity, no sexual activity. It did not involve bestiality, violence, or extremely young children such as toddlers or infants. Significantly, he never paid for any of the images. He never even left the Bing Image search webpage. In other words, he mistakenly followed suggested searches which led him to an illegal image, but he never took any affirmative steps to access images of underage females or other images violative of federal or state law. Nor did he ever create any sexual images for sale or swapping on the internet or for his own use. And never has it even been implied that he ever engaged in any sexual wrongdoing with any minor. Moreover, all evidence demonstrates that he has not tried to minimize his conduct vis-à-vis law enforcement. Rather, he has been fully cooperative with law enforcement at every stage of this

incident, and has wholly complied with all conditions and limitations placed on him thus far by the judicial system.

Since his arrest he has worked closely with George Dowd, a psycho-therapist in private practice, to understand the root causes of his behavior. These weekly sessions have allowed Defendant to understand that he was addicted to his work, that the stress and tension were resulting in havoc in his personal life, most tangibly resulting in insomnia, which culminated in masturbation using internet pornography on his smartphone in order to sleep.

Not only has he worked closely with Dowd, but also with his wife, extended family, and a wide network of friends to understand the root causes of this incident (work addiction). He is adamant that this will never happen again. Both he and his wife (who also spent an inordinate amount of time with her job) are committed to ensuring that he never access child pornography or any sort of illegal images ever again.

He is ashamed and extremely remorseful for his behavior. His actions have led to the loss of his job but, more importantly, have completely upended his life, causing him to re-examine his choices, values, decisions, and future. He is committed to taking better care of himself, avoiding the work addiction which is at the root of his wrongful behavior, and, more importantly, avoiding any access, use, possession, or interest in illegal pornography or that depicting underage minors.

### E. Psychological Report

Mr. Poese has been seeing George Dowd, Psychotherapist, since his arrest – in fact, the day after the FBI search of his home. Mr. Poese has been seeing Mr. Dowd on a weekly and biweekly basis. Mr. Dowd prepared a report for the Court which states that "he does not meet the criteria for any type of violent sexual predator. He does have a healthy sexual relationship with

his wife. He does not engage in any type of other aberrant sexual behaviors, such as voyeurism or exposing himself to others. He does not have any type of fantasies about rape or sexual activity with children." (See attached Report at p.3.) Mr. Dowd added that Mr. Poese "is deeply remorseful for the choices that he made. He is taking full responsibility for his actions. He feels that he and his family's lives have been devastated by his behavior. He indicates true remorse." (See attached Report at p.3.) He concluded that he does not view Mr. Poese "as a risk for relapsing back into this type of behavior." (See attached Report at p.3.) Moreover, he "believe[s] that his chances of reoffending are unlikely." (See attached Report at p.4.)

## III. Legal Framework

### A. Introduction

While this Court must still correctly calculate the guideline range, Gall v. United States, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, id. at 51; Nelson v. United States, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). Kimbrough v. United States, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," id. at 49-50, and explain how the facts relate to the purposes of sentencing. Id. at 53-60; Pepper v. United States, 131 S. Ct. 1229, 1242-43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Id. at 101; Pepper, 131 S. Ct. at 1242-43. A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary

[from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." Kimbrough, 552 U.S. at 101-02 (internal punctuation omitted) (citing Rita v. United States, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

In order to deliver reasonable sentences for child pornography offenses, a detailed recategorization and typology of offenders is warranted. The divisions below offer a tentative illustration of one possible taxonomy, suggested by one court. Each category implies different mental states, which need to be considered when tailoring appropriate punishment and measures for control.

• Possession-only child pornography users: This category includes those viewers and consumers of child pornography who *download* images of child pornography. It frequently includes individuals with the lowest degree of culpability. Often, defendants in this category do not have the *mens rea* threatening actual contact with a minor. (This lowest category characterizes Defendant's conduct).

• Possession and involuntary distribution: This category comprises those individuals who possess child pornography they downloaded and are deemed to have engaged in distribution due to the nature of the technology used for downloading the images. The individuals in this category *may not intend to distribute* child pornography. For example, this category would include child pornography users who download images via peer-to-peer file sharing sites which may render files automatically accessible to others.

• Possession with intentional distribution: This category comprises those individuals who *possess and intentionally distribute* child pornography to other users, but *not for commercial gain.* Offenders in this category display a higher degree of culpability; the trade and exchange of such images significantly contributes to the child pornography market, perpetuating the severe harm suffered by children in production.

• Possession with intentional distribution for commercial gain: This category encompasses individuals who *profit from the trade in child pornography.* This conduct is extremely serious. It not only contributes to the existence of the market, but defendants in this category tend to be driven by unchecked pecuniary concerns rather than a mental illness amenable to curative medical treatment.

• Online communications with minors without intent to engage in contact: This category includes those child pornography users who view child pornography while concurrently engaging in online communications with minors, without the intention, or with little or no

likelihood, to engage in any physical contact with them. The adverse effect on the child of such inappropriate conduct may be serious.

• Online communications with minors intending to engage in contact: This category represents individuals with a high degree of culpability. They possess the *mens rea* that is likely to lead to actual contact with minors. Individuals falling within this category represent a serious risk to the public. The contact ranges from talk to coitus.

• Production of child pornography: Defendants in this category engaged, and are most likely to engage in the future, in the sexual exploitation of a minor. This group potentially constitutes a most serious and dangerous category of child pornography offenders. Defendants in this category can be further differentiated based on factors such as the type of images produced, the quantity, and their role in the production. Some involve photographing rapes of young children by a parent and other relatives or friends of the family. Such incestuous relationships are particularly hard to ferret out.

U.S v. R.V., 157 F. Supp. 3d 207, 211-212 (E.D. N.Y. 2016). While the current Guidelines for

child pornography offenses appear to recognize most of these broad categories, several of the

Commission's relevant sentencing enhancements tend to apply indiscriminately to all child

pornography offenders, greatly increasing the recommended punishment range without

necessarily reflecting an individual's heightened level of culpability. *See* U.S. Sentencing

Comm'n, *Federal Child Pornography Offenses* (Dec.2012), at 320-21 (recognizing that "[t]he

current sentencing scheme ... places a disproportionate emphasis on outmoded measures of

culpability regarding offenders' collections," and recommending that the Guidelines be revised to

"more fully account" for: the content of an offender's child pornography collection and nature of

his collecting behavior; the degree of the offender's involvement with child pornography

communities; and an offender's history of "sexually dangerous behavior"). In other words, the

current scheme for calculating the appropriate sentence of an individual found to be in

possession of child pornography is deeply flawed, suggesting that a Guidelines-based sentence

may be inappropriate -- as in this case.

## B. The Sentencing Commission's Report to Congress

"There is widespread agreement among judges, lawyers and legal scholars that the guidelines for child pornography offenses are seriously flawed." United States v. Childs, 976 F.Supp.2d 981, 982 (S.D.Ohio 2013). Indeed, the belief that the child pornography sentencing guidelines are flawed is shared by the Sentencing Commission and the United States Department of Justice. In fact, in February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. See U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012) (hereinafter "Child Pornography Report"). The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," id. at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." Id. at ii, 323. The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." Id. at iii, xi; id. at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." Id. at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," id. at xi, the "current

guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," id. at 323. The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." Id.

In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct." Id. at 84. Some offenders "acquire enormous and often well-organized collections," sometimes up to hundreds of thousands of images; some "intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers," id. at viii, 84-92; and some have collected material over "a series of decades" beginning in the pre-Internet era, id. at 80. The variety of images readily available on the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality." Id. at 80-81, 90-91. Some offenders "are very discriminating" and limit their collection by preference. Id. at 81. Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer networks to receive or distribute material "in an indiscriminate manner," while others "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." Id. at viii, 61-62. The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market." Id. at 98-99. The

Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." Id. at 79. It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" id. at 278 & n.31 (quoting Center of Sex Offender Management, The Comprehensive Approach to Sex Offender Management 5 (2008). The Commission emphasized that "not all child pornography offenders are pedophiles or engage in other sex offending." Id. at 104. Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. Id. at ix-x, 204-05. However, "the current guideline measures for offender culpability (e.g., for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." Id. at 204. The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." Id. at xx; see also id. at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." Id. at xviii, 322. Further, the Commission recommended that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (e.g., the extent to which an offender catalogued his child pornography

collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." Id. at xviii-xix, 322-233. See also Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation Prevention and Interdiction, Office of the Deputy Attorney General, U.S. Dep't of Justice, to Honorable Patti B. Saris, Chair, U.S. Sentencing Comm'n, at 1 (Mar. 5, 2013), available at http://sentencing.typepad.com/files/doj-letter-to-ussc-on-cp-report.pdf (last visited July 2, 2014) (hereinafter "DOJ letter") ("the Department agrees with the Commission's conclusion that advancement in technology and the evolution of the child pornography "Market" have led to a significantly changed landscape—one that is no longer adequately represented by the existing sentencing guidelines").

### C. Current Evidence Refutes Congress's Reasons for Increasing Penalties.

Mr. Poese's sentence is based, in part, on application of § 2G2.2. Congress directed the Commission to take several actions relevant to Mr. Poese's guideline calculation: (1) increase the base offense level from 10 to 13 in 1991; (2) increase the base offense level from 13 to 15 in 1995; and (3) add the 2-level enhancement for use of a computer. Congress did not make formal findings in support of any of these actions, but its reasons can be gleaned from the legislative history. This history suggests that Congress acted on three primary beliefs: (1) child pornography possessors are pedophiles who use pornography to sexually abuse children; (2) increasing penalties for possessors will dry up the market and thereby prevent the sexual abuse of children by removing the market incentive for those who abuse children for the purpose of producing new images; and (3) severe penalties will deter others from possessing child pornography. Each belief is based on assumptions that current empirical evidence refutes.

## 1. The belief that child pornography possessors are pedophiles who use pornography to molest children

When it directed the Commission in 1991 to increase the base offense level from 10 to 13, Congress acted on the belief that those who possess child pornography are actually predatory child molesters who use pornography to desensitize, lure, entice, or coerce children to be sexually abused. See, e.g., 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (stating that "child pornography plays a central role in child molestations by pedophiles" and is "directly connected to child molestation," citing a congressional commission report stating that pedophiles use child pornography to "lower a child's inhibitions in order to sexually abuse the child"); id. at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) ("[T]hose who receive child pornography through the mails are often also involved in the actual sexual abuse of children – or at the very least meet the psychological profile of those likely to engage in molesting children."). When Congress directed the Commission in 1995 to increase the base offense level from 13 to 15, its discussion focused on "predatory pedophiles [who] sell, purchase and swap" child pornography to "satisfy prurient desire." 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley). And while there was never any direct discussion in Congress of the enhancements for material depicting sadistic or masochistic conduct or the number-of-images table, Congress referred to child pornography as a "tool used by pedophiles to break down the inhibitions of children" and "act out their perverse sexual fantasies" in support of the Feeney Amendment, which added these enhancements. See 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch). Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers. However, this belief is not supported by current research. In brief, "the evidence to date strongly and rather consistently shows that child pornography consumption itself does not represent a risk factor for contact sexual crimes." Melissa Hamilton, The Child Pornography Crusade and Its

Net-Widening Effect, 33 Cardozo L. Rev. 1679, 1723-24 (2012). Instead, "multiple studies show that child pornography offenders are at a much lower risk for contact sexual offending than previously known contact offenders." Id. at 1723. Moreover, studies show that a finding of pedophilia "is not synonymous with either contact sexual abuse or child pornography." Id. at 1715. The Commission confirms that "not all child pornography offenders are pedophiles or engage in other sex offending." Child Pornography Report at 104.

Mr. Poese has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no risk of harming a child. This distinguishes Mr. Poese from the offenders Congress had in mind. Nor is there any evidence that the nature or number of images possessed bear on the likelihood that an offender is a child molester. In fact, Dr. Brian Stark, Defendant's personal physician, wrote that Defendant is a "decent, honest and thoughtful person" who is a "fantastic role model to children and adults alike . . ." and as his personal physician, he has "no evidence of pedophilia or any other sexual or behavioral aberrancy or disorder." See Stark Letter, attached. Likewise, Defendant's wife has averred that he has no sexual abnormalities much less any that pose a risk to anyone.

## 2. The belief that severe punishment for possession will dry up the market and prevent the abuse of children

In initially criminalizing the possession of child pornography, Congress acted on the view that those "who possess and view" child pornography represent the "market" for the production of child pornography, and that punishing child pornography possessors will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr. 20, 1990) (Senator Thurmond). It relied on this same view when it directed the Commission to increase the base offense level in 1991. See 137 Cong. Rec. S10323

(July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child pornography if we want to stop child molestations and put a dent in the child pornography trade."). And when it directed the Commission to add the 2-level enhancement for use of a computer, Congress was concerned with deterring the online distribution and trade of child pornography. 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Hatch) (purpose was to "increase[e] penalties for the use of computers in connection with the distribution of child pornography," in part to "ensure that [the information super] highway is not littered with the debris of child pornography"); see also id. (Senator Grassley) (purpose was to "discourage child pornographers from using computers to trade in child pornography").

But Congress was mistaken. The production, trading, and viewing of child pornography takes place in a global market that cannot be significantly impacted by severe penalties in the United States. Many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of child pornography. John Carr, Commonwealth Internet Governance Forum, A Joint Report on Online Child Protection Combatting Child Pornography on the Internet 19 (2010). As a result, there is a large, international legal market for child pornography that exists whether Mr. Poese is incarcerated for one day or ten years. This market is not organized, but is mostly comprised of amateur collectors who can freely and easily obtain images, increasingly via peer-to-peer networks, and thus does not operate by the ordinary rules of supply and demand. In this context, severe punishment of a marginal consumer can have little impact on the proliferation of child pornography on the Internet.

The Sentencing Commission acknowledges that there is no social science research to support the theory that criminal punishment affects the child pornography markets since the advent of the Internet and file sharing programs. Child Pornography Report at 98. Moreover,

while Congress was concerned that computers would make it easy for dangerous offenders to disseminate and trade images, it did not tailor the computer enhancement to meet that concern. Instead, it required the Commission increase penalties for those who are not dangerous and who did not use the computer in the ways Congress imagined. The Commission has recognized that the enhancement sweeps too broadly and indicated that the use of a computer might appropriately be considered an aggravating factor only when it was used to widely disseminate pornography or to make it accessible to children. See U.S. Sent'g Comm'n, 1996 Report, at 28-30 & n.23; see also Dorvee, 616 F.3d at 95 (recognizing the Commission's criticism); Phinney, 599 F. Supp. 2d at 1042 ("[S]ome computer users are more harmful than others, yet the enhancement provided no distinction.").

Here, Mr. Poese did not use his computer to trade or knowingly disseminate images, or to make images accessible to children. Again, he is not the offender Congress had in mind. Several courts have found that there is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." Beiermann, 599 F. Supp. 2d at 1103; id. at 1103-04 (noting that while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."); United States v. Stern, 590 F. Supp. 2d 945, 952 n.5 (N.D. Ohio 2008) ("The Court is … forced to note the somewhat limited impact of domestic prosecution for a fundamentally international crime. . . . [N]o court should be deluded into believing that limiting domestic consumption alone can eradicate the international market for child pornography."); Kelly, 2012 WL 236 7084, at *5 ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet,

or deterred 'hands-on' abuses against children. To the contrary, while prosecutions of child pornography have skyrocketed, prosecutions of actual sexual abuse of children have remained constant."). They recognize that possessing even large numbers of images does not affect the market. Id. at *7 ("[T]he tragic realities are such that downloading 500 widely-available images has virtually no effect on the market. Sadly, the worldwide market for child pornography is so vast that the relative impact of several hundred additional images is minuscule, yet results in a significant increase in the guideline range.") (internal quotation and citation omitted); United States v. Raby, 2009 WL 5173964, at *6-7 (S.D. W. Va. Dec. 30, 2009) ("The worldwide market for child pornography is so vast that the relative market impact of [] having even additional images is miniscule.").

### 3. The belief that punishing possessors of child pornography will deter the commission of child pornography offenses

Congress has also apparently relied on the view that severe penalties will deter others from possessing child pornography. In support of criminalizing the possession of child pornography, Senator Thurmond said that "tough penalties . . . will be a deterrent to those who would sexually exploit children." 136 Cong. Rec. S9029 (June 28, 1990). But to the extent that Congress believed that increasing penalties will deter others from possessing child pornography, it was mistaken. Empirical research is unanimous that more severe sentences do not decrease the likelihood that others will commit crimes. To the extent that Congress meant to deter child pornography possessors themselves from committing further crimes, all of the empirical research is in agreement that imprisonment does not reduce recidivism. See, e.g., Tina L. Freiburger & Brian M. Iannacchione, An Examination of the Effect of Imprisonment on Recidivism, 24 Crim. Just. Stud. 369, 377 (2011) ("The results indicate that incarceration did not affect either offenders' likelihood of recidivating or the severity of recidivism."). Instead, "across the

offender population, imprisonment does not have special powers in persuading the wayward to go straight. To the extent that prisons are used because of the belief that they reduce reoffending more than other penalty options, then this policy is unjustified." Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011) ("[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions."). As for why this is so, the Commission and scholars have identified numerous "criminogenic" effects of incarceration, including that prison serves as a school for criminals; severs ties to family and community; diminishes employment options upon release; and reduces rather than increases the inmate's willingness or ability to conform to social norms.[1] Instead, treatment works. The Commission reports that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant.'" Child Pornography Report at 278 & n.31 (quoting Center of Sex Offender Management, The Comprehensive Approach to Sex Offender Management 5 (2008)).

In sum, each of Congress's actions rested on unfounded assumptions. As the Commission has noted, congressional directives "creat[e] anomalies in the guidelines structure" and "new sentencing disparities," and "are potentially in tension with the fundamental Sentencing Reform Act objectives of delegating to an independent, expert body in the judicial branch of the government the finer details of formulating sentencing policy, and revising that policy in light of actual court sentencing experience over time." U.S. Sent'g Comm'n, Mandatory Minimum Penalties in the Federal Criminal Justice System 122-23 (1991). Yet, as shown next, the relevant amendments promulgated by the Commission by its own choice were also without empirical support.

**D. Enhancements That Apply In Nearly Every Case Do Not Serve Their Purpose.**

The Probation Office recommends a two-level increase for involvement of a prepubescent minor, pursuant to § 2G2.2(b)(2). In 2018, 94.1% of the 1482 offenders sentenced under § 2G2.2 received this enhancement. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2018/Use_of_SOC_Guideline_Based.pdf. In other words, this enhancement was applied in nearly every case that year. Thus, this characteristic describes conduct that is "essentially inherent to the crime itself," not an aggravating factor describing a more serious offense or higher risk of harm. Kelly, 868 F. Supp. 2d at 1208-09.

Likewise, the Probation Office recommends a two-level increase for use of a computer like device, pursuant to § 2G2.2(b)(6). In 2018, 96.6% of the 1482 offenders sentenced under § 2G2.2 received this enhancement. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2018/Use_of_SOC_Guideline_Based.pdf. Again, this percentage shows that this crime is so associated with use of a computer or computer like device, that this factor is essentially part of the crime itself.

As one court has recognized, enhancements that apply in "almost every case" are contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense." Robinson, 669 F.3d at 778 (discussing the enhancement for "use of a computer"). Such enhancements render § 2G2.2 an "anomaly." Id. The Sentencing Commission confirms that "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely

apply to the vast majority of offenders," id. at xi, so that the "current guideline does not

adequately distinguish among offenders regarding their culpability for their collecting

behaviors," id. at 323. Because the enhancements for computer use and prepubescent girls "now

apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their

culpability." Child Pornography Report at ii, xi, 209, 323. The Report goes on to support

Defendant's contention that these enhancements do not accurately depict the severity of the

Defendant's offense.:

> Innovations in digital cameras and videography as well as in computers and Internet-related technology, such as peer-to-peer ("P2P") file-sharing programs, have been used by offenders in the production, mass distribution (both commercial and non-commercial distribution), and acquisition of child pornography. These technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre that previously was not as widely circulated as it is today. As a result of such changes, entry-level offenders now easily can acquire and distribute large quantities of child pornography at little or no financial cost and often in an anonymous, indiscriminate manner.

> Several provisions in the current sentencing guidelines for non-production offenses—in particular . . .an offender's use of a computer, and distribution of images—originally were promulgated in an earlier technological era. Indeed, most of the enhancements, in their current or antecedent versions, were promulgated when offenders typically received and distributed child pornography in printed form using the United States mail. As a result, enhancements that were intended to apply to only certain offenders who committed aggravated child pornography offenses are now being applied routinely to most offenders.

United States Sentencing Commission, Child Pornography Report at 312-313.

Significantly, the Department of Justice agrees with the Sentencing Commission's general

conclusion:

> [T]he Department agrees with the Commission's conclusion that advancements in technologies and the evolution of the child pornography "market" have led to a significantly changed landscape—one that is no longer adequately represented by the existing sentencing guidelines. Specifically, we agree with the Report's conclusion that the existing Specific Offense Characteristics ("SOCs") in USSG § 2G2.2 may not accurately reflect the seriousness of an offender's conduct, nor fairly account for differing

degrees of offender dangerousness. The current guidelines can at times under-represent and at times over-represent the seriousness of an offender's conduct and the danger an offender possesses.

*DOJ Letter* at 1.

In child pornography cases, increases in offense levels are relevant and proper when the crime is furthered, increased, or truly enhanced by that specific conduct. But if almost all child pornography cases involve the use of a computer, then this conduct is not supportive of an enhancement, but is, in most cases, intertwined with the crime itself. The simple use of a computer in these circumstances would not be worthy of the computer enhancement. If, on the other hand, an individual was specifically using a computer to further his crime—such as disseminating self-produced content or using high-end computer software to encrypt, mask, steal, trade, sell, or barter child pornography, then a computer-triggered enhancement would be warranted. Herein, no evidence indicates that Defendant was compulsively or obsessively or repeatedly searching for photos of very young girls, that he was using his computer to create or share or store illegal photos, or that the possession of the single illegal photo or use of electronic devices took him outside of the heartland of the child pornography offense. In other words, no evidence supports application of these two enhancements to his sentencing rubric.

## IV. Requested Sentence

### A. Introduction

This Court is required to consider "the kinds of sentences available" by statute. 18 U.S.C. § 3553(a)(3). Congress has provided for a range of sentences, from a term of probation of one to five years to 10 years' imprisonment, and if a term of imprisonment is imposed, has authorized a term of supervised release of at least five years and at most life. See 18 U.S.C. §§ 2252(a)(4)(B), (b)(2), 3583(k). "Congress thus not only envisioned, but accepted, the possibility that some

defendants found guilty of that subsection of the statute would receive no jail time at all." United States v. Husein, 478 F.3d 318, 332 (6th Cir. 2007) (upholding sentence of one day in prison followed by three years' supervised release where statutory range for drug trafficking was 0-20 years).

Based on the above analysis, this Court has ample grounds to decline to follow § 2G2.2. In order to take account of the extensive and compelling evidence that any term of imprisonment would be harsher than necessary in light of Mr. Poese's family circumstances, low risk of recidivism, and successful efforts in therapy, Mr. Poese asks this Court to impose a sentence of one day in custody, a significant period of home confinement with work release privileges, and five years' supervised release with conditions.

Further, Defendant wholly consents to the suggested computer monitoring, and would willingly permit the Probation office to install monitoring software on any computer he owns or to which he has access. Unlike the advisory guideline range of 30-37 months in prison, the requested sentence is "sufficient, but not greater than necessary" to serve sentencing purposes under § 3553(a).

The previous discussion shows that Mr. Poese's offense is less serious than the offenses Congress had in mind, and that Mr. Poese is not the dangerous offender Congress had in mind, when it required severe penalties in child pornography cases. It is important to note that Mr. Poese has been continuously and gainfully employed since 1995 (upon graduating from college with an engineering degree) and has been a productive member of society. He is highly educated, a hard worker, motivated, and devoted to his family and community. Mr. Poese has taken responsibility for his misconduct and is remorseful. He has affected his own family and

adversely affected so many people. But he seeks to be accountable to his family and friends and has taken steps to ensure that this crime will not happen again.

Significantly, his psychotherapist, trained to assess sexual aberration and recidivism risks, has concluded that he does not view Mr. Poese "as a risk for relapsing back into this type of behavior." (See attached Dowd Report at p.3.) Moreover, he "believe[s] that his chances of reoffending are unlikely." (See attached Dowd Report at p.4.)

As eloquently stated by his friend Adam Bonner, a Manager at Amazon: "Matt is full of regret and remorse and there's not a single minute of a single day that goes by where Matt doesn't wish he could undo his actions." In addition, "this will be the greatest mistake of Matt's life and shouldn't define who he is. It has realigned his moral compass and I have zero doubt that nothing like this will ever happen again."

### B. Given the Nature and Circumstances of Mr. Poese's Offense and His History and Characteristics, the Sentence Requested is Sufficient, but not Greater Than Necessary, to Satisfy the Purposes of Sentencing.

In enacting the Sentencing Reform Act, Congress did "not favor[] one purpose of sentencing over another," except that rehabilitation was not to be a reason to impose a sentence of incarceration. See S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case," and "one purpose of sentencing may have more bearing on the imposition of sentence in a particular case than another purpose has." Id. at 68. In choosing what kind of sentence to impose, the court "must consider" all of the purposes and factors set forth in § 3553(a). Id. at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." Id.; see also United States v. Bridgewater, 479 F.3d 439, 442 (6th Cir. 2007) ("often one or two [purposes] prevail, while others pale"). Here, all of the purposes of sentencing

point in the same direction. Mr. Poese's offense is less serious than the offenses Congress had in mind, and he is not the dangerous offender Congress envisioned. Incarceration is not necessary to protect the public, and would be a particularly harsh punishment for Mr. Poese, who is 48 years old and has a family who depends on him. Mr. Poese's family circumstances, education and solid employment history point to a very low risk of further offending. He is currently involved in seeing a therapist on a weekly basis, who is helping him deal with his addiction to work, which led to his stress, insomnia, masturbation to sleep, use of pornography, all which culminated in his obtaining illegal images from the internet. As an offender who has shown a commitment not only to attending weekly therapy, but being fully receptive to the insights his therapist have provided him, his already very low likelihood of reoffending is even further reduced.

## C. Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a)(2)(A)

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters.[2] Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers. Aside from the lack of evidence to support this belief in general, see Child Pornography Report at 104 (confirming that "not all child pornography offenders are pedophiles or engage in other sex offending") Mr. Poese has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no risk of harming a child. This distinguishes Mr. Poese from the offenders Congress had in mind, and is therefore highly relevant to this Court's determination of the appropriate sentence. See United States v. Marshall, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) (rejecting presumption that "those who view child

pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation"); United States v. Kelly, 868 F. Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting government's argument that guideline range is appropriate because of the "chance that [defendant] will molest children in the future, or that he has in the past," as this "speculation is directly contrary to submissions by Kelly's therapist and Kelly's psychiatrist," the defendant "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); United States v. Cruikshank, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); United States v. Phinney, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis."); United States v. Grober, 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), aff'd 624 F.3d 592 (3d Cir. 2010).

Another primary justification for severely punishing child pornography possessors is that they support the market for child pornography and thus encourage the abuse of more children in order to create new images. See 136 Cong. Rec. S4730 (Apr. 20, 1990). Aside from the evidence that disproves this belief in general, Mr. Poese did not pay for or trade any images. Under these circumstances, where no economic or other incentive was given to anyone to create or post more or newer images, there was "no market effect" from Mr. Poese's actions. Troy Stabenow, A

Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines, 24 Fed. Sent'g Rep. 108, 124-25 (2011). Relatedly, there is no research to support the theory that criminal punishments have affected the child pornography markets since the advent of the Internet and file sharing programs. 2012 Report to the Congress: Federal Child Pornography Offenses at 98 ("Child Pornography Report")

(found at https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses). In addition, technology has changed the nature of this offense. In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, (United States v. Bistline, No. 2:09-cr-00085-JLG-TPK (S.D. Ohio Jan. 7, 2010)) whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort. As a result, less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously. Before widespread dissemination on the Internet, only those bold enough to seek out child pornography by contacting suppliers directly or through the mail were able to obtain it. In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer. See U.S. Sent'g. Comm'n, Report to the Congress: Sex Crimes Against Children 29 (1996) [U.S. Sent'g Comm'n, 1996 Report]. In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer. U.S. Sent'g. Comm'n, Use of Guidelines and Specific Offense Characteristics (2011).

The Internet, by rendering child pornography immediately and anonymously accessible, has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been committed. See Andreas Frei et al., Pedophilia on the Internet—A Study of 33 Convicted

Offenders in the Canton of Lucerne, 135 Swiss Med. Weekly 488, 492 (2005); see also Jérôme

Endrass et al., The Consumption of Internet Child Pornography and Violent Sex Offending, 9

BMC Psychiatry 43, 44 (2009); L. Webb et al., Characteristics of Internet Child Pornography

Offenders: A Comparison with Child Molesters, 19 Sexual Abuse 449, 450 (2007). In short, the

change in technology is relevant, in part, because it means that even as the population of child

pornography offenders has become less dangerous, punishment has greatly increased. See

Richard Wollert, PhD, The Implication of Recidivism Research and Clinical Experience For

Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to

the U.S. Sentencing Commission at 4-5 (Feb. 15, 2012).

     According to the Commission, "technological changes have resulted in . . . ready

accessibility of child pornography," including graphic sexual images of very young victims,

which "previously was not widely circulated." Child Pornography Report at 6. Now that the

"typical" child pornography case involves images depicting "prepubescent children engaging in

sexually explicit conduct," id. at 84, the current guideline "does not adequately distinguish

among offenders regarding their culpability for their collecting behaviors" and is "overly severe

for some offenders in view of the nature of their collecting behavior," id. at 322-23, such as those

like Mr. Poese who did not deliberately or discriminatingly select or catalogue their images, id.

at 84-92. While Mr. Poese intentionally accessed and viewed one image of child pornography,

see 18 U.S.C. § 2252(a)(4)(B), he did not knowingly share files. The Commission acknowledges

that the guidelines should, but do not, distinguish among offenders based on their technological

sophistication. See Child Pornography Report, at viii, xix, 56-62.

     In determining an appropriate sentence, this Court must consider the sentences available

by statute. See 18 U.S.C. § 3553(a)(3). Congress set the statutory range of imprisonment for Mr.

Poese's offense at zero to twenty years, and authorized a term of probation. See 18 U.S.C. § 2252(b)(2); 18 USC § 3561(a); 18 USC § 3559(a). Specifically, 18 U.S.C. § 2252(b)(2) provides:

> Whoever violates, . . . paragraph (4) of subsection (a) shall be fined under this title or imprisoned not more than 10 years, or both, but if any visual depiction involved in the offense involved a prepubescent minor or a minor who had not attained 12 years of age, such person shall be fined under this title and imprisoned for not more than 20 years, .. .

As many courts have observed, the child pornography guideline, by enhancing sentences based upon factors that are inherent in the crime and thus appear in nearly every case, concentrates offenders at or near the statutory maximum and thus fails to meaningfully distinguish more serious offenders from less serious offenders. As one court observed, sentences at or near the statutory maximum should be reserved for the "worst possible variation of the crime" committed by the most dangerous offender. See United States v. Aleo, 681 F.3d 290, 302 (6th Cir. 2012). Mr. Poese's conduct and characteristics could not be farther from these. He has never improperly touched a child, he did not share files, he admitted what he had done as soon as the agents appeared with a search warrant, and he has fully accepted responsibility for his offense. No evidence indicates he presents any risk of ever harming a child. His family reports that this behavior was not consistent with his character and believes that he will never engage in that kind of behavior again. Mr. Poese is the offender for whom the minimum statutorily authorized punishment is reserved.

### D. Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence. Lengthy imprisonment of child pornography possessors appears to have no deterrent or preventive effect on the production or dissemination

of child pornography. This is in part because the production and dissemination of child pornography is a widespread, international problem. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." Beiermann, 599 F. Supp. 2d at 1103; id. at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."). In fact, the Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and P2P file-sharing." Child Pornography Report at 98.

　　Relatedly, the questionable deterrent value of a lengthy sentence is particularly significant given the unreasonable harshness of the Guidelines for an offense of child pornography possession, of which Defendant is charged, which has been recognized by courts and judges from across the country. See, e.g., United States v. Pulsifer, 469 Fed.Appx. 41, 44 (2d Cir.2012) (describing the "unusually harsh impact of the child pornography Guidelines"); United States v. Stone, 575 F.3d 83, 97 (1st Cir. 2009) (expressing the "view that the sentencing guidelines [for child pornography] are in our judgment harsher than necessary"); United States v. Henderson, 649 F.3d 955, 964 (9th Cir.2011) (Berzon, J., concurring) (describing the "unjust and sometimes bizarre results" that follow from application of the child pornography Guidelines); Jelani Jefferson Exum, What's Happening with Child Pornography Sentencing?, 24 Fed. Sent'g Rep. 85, 89 (2011) ("growing consensus among district court judges and the broader legal community that federal sentences for possession of child pornography are too harsh"); U.S.

Sent'g Comm., Results of Survey of U.S. Dist. Judges, Jan. 2010 through Mar. 2010, Question 8 (June 2010) (finding that 70% of United States District Judges believe Guideline range for child pornography possession is too high and 69% of United States District Judges believe range for child pornography receipt is too high).

Mr. Poese recognizes the great harm inflicted on the minor female depicted in the illegal image he viewed. He has participated in weekly treatment, and in doing so, has reached a clear understanding of how having others view these images negatively impacts child victims.

In assessing whether Defendant would be deterred by a sentence handed down by this Court, comments offered by Dr. Tricia Busby, Clinical Psychologist, are illuminating. As indicated in the attached letter, she is a clinical psychologist who specializes in Forensics and has twelve years of experience working with offenders convicted of sexual crimes. Her resume indicates that she has written several forensic reports for judicial purposes and, for the previous three and a half years, has supervised forensic psychologists who write forensic reports to the court involving California's Sexually Violent Predators and Mentally Disordered Offenders. With her extensive experience in research regarding sexual offenders as well as sexual and violence risk, her comments on Defendant's potential for recidivism are valuable. She indicates in her letter to the Court that sexual offense research indicates that of those persons charged and/or convicted of possession of child pornography, a number of protective factors are correlative with lower rates of future sexual offenses:

- Intelligence (Defendant possesses a Doctorate degree in engineering and physics, with a specialty in acoustics);
- A stable work history (Defendant has been consistently employed since his graduation from graduate school);

- A stable financial history (Defendant has enjoyed financial security despite taking a significant pay cut to work for his beloved Camp Fitch);

- Lower levels of antisociality (Seto, M.C. (2008). Pedophilia and Sexual Offending Against Children: Theory, Assessment, and Intervention. Washington, DC: American Psychological Association) and (Seto, M.C., &amp; Hanson, R.K. (2011). Introduction. Special issue on Internet-facilitated sexual offending. Sexual Abuse: A Journal of Research and Treatment, 23, 3–6.) (Mr. Poese does not have a previous criminal history and has been, by all accounts an upstanding citizen and pillar of his community for many years.);

- Secure attachment in childhood and a close intimate relationship with an adult (de Vries Robbe, M., de Kogel, V., Koster, K., Bogaerts, S. (2015). An exploration of protective factors supporting desistance from sexual offending. Sexual Abuse: A Journal of Research and Treatment, 27, 16-33; 2 Hanson, R. K., Harris, A. J. R., Scott, T.-L., &amp; Helmus, L. (2007). Assessing the risk of sexual offenders on community supervision: The Dynamic Supervision Project (User report, Corrections research). Ottawa, ON, Canada: Public Safety Canada. Retrieved from http://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/ssssng-rsk-sxl-ffndrs/index-eng.aspx) (Mr. Poese has had a close emotional relationship with his parents, denies suffering any emotional, physical or sexual abuse as a child, has a close and stable relationship with his wife of about twenty years, enjoys the support of his wife and two daughters have throughout this situation, and has collected approximately 150 letters of support on his behalf from family, friends and community members);

- Lack of a history of substance abuse or mental health problems (Mr. Poese does not have a prior history of substance use or mental health treatment);

- Cognitive or impulsivity problems (Defendant suffers from neither); and

- Lack of a sexual interest in children (Defendant reported that it was a story about the ability to access child pornography through a Bing on-line search that peaked his curiosity out of disbelief that it was possible to access child pornography through such a search);

- Lack of emotional identification with children (Defendant does not emotionally identify with children);

- The ability to empathize with others (Defendant's academic research at Penn State was focused on human betterment, and his time with Camp Fitch was centered on improving campers' experience in a supportive, nurturing environment); and

- The ability to cooperate with supervision and to obtain professional care (Mr. Poese has complied with all conditions of his pre-trial release, has had no violations of his Internet restrictions, has been on house arrest since July, and has consistently attended weekly sessions with a psycho-therapist; he is motivated for treatment and has engaged in deep self-reflection).

Dr. Busby further reiterates the point made previously that current sentencing laws are based on the premise that someone found in possession of child pornography correlates with a high potential to, in the future, commit a contact sexual offense. However, she emphasizes that the research simply does not support this notion; rather, fewer than three percent involved with child pornography possession go on to commit a violent or sexual offense in the future. (See Eke, A.W., &amp; Seto, M.C. (2012). Risk assessment of online offenders for law enforcement. In K.

Ribisl &amp; E. Quayle (Eds.), Internet Child Pornography: Understanding and Preventing On-line Child Abuse (pp. 148–168). Devon, England: Willan.) And she cites another study that followed person's convicted of child pornography possession from one and a half to six years found that only two percent were convicted of a contact sexual offense in that time period and only three percent were convicted of possession of child pornography again. (Eke, A.W., Seto, M.C., &amp; Williams, J. (2011). Examining the criminal history and future offending of child pornography offenders: An extended prospective follow-up study. Law and Human Behavior, 35, 466–478.)

In summary Mr. Poese possesses many protective factors that lower his risk for committing a sexual offense in the future. He also possesses many positive attributes that allow him to continue making contributions to his family and the community. He as a long history of stability in all of his life domains. Based on research he is at very low risk of committing a sexual offense in the future and has not demonstrated any problematic behaviors since being on house arrest. A responsible judicial system adhering to the risk principle of effective corrections, would suggest that legal, policy and clinical responses to child pornography possession offenders, like Mr. Poese, should be proportional to their risk. Given Mr. Poese's very low level of future sexual offense risk supervised probation seems to be the most appropriate legal response.

### E. Need for Incapacitation, 18 U.S.C. § 3553(a)(2)(C)

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children. This belief is contrary to the empirical research in general, and is unjustified based on

the evidence in this case. Current empirical research demonstrates that "first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any kind], in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography)," Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sent'g. Comm'n at 4 (Feb. 15, 2012),[3] and "online offenders who had no history of contact offenses almost never committed contact sexual offenses." Michael C. Seto et al., Contact Sexual Offending by Men With Online Sexual Offenses, 23 Sexual Abuse 124, 137 (2011); Helen Wakeling et al., Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact sexual offenses."); Jérôme Endrass et al., The Consumption of Internet Child Pornography and Violent Sex Offending, 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, The Criminal Histories and Later Offending of Child Pornography Offenders, 17 Sexual Abuse 201, 207-08 (2005) (finding that 1.3% of those who had committed child pornography offending only recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb et al., Characteristics of Internet Child Pornography Offenders: A

Comparison with Child Molesters, 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism"). As one district court recently put it, "the empirical literature [] generally concludes that there is little—if any— evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses." Marshall, 870 F. Supp. 2d at 492.

Child pornography offenders at low risk to re-offend in general. Further, there is no evidence that Mr. Poese has an antisocial personality, indicating that his risk of sexual violence is low. No evidence suggests that Mr. Poese poses any physical danger to children; he is highly unlikely to repeat the offense, or engage in similar activities. Indeed, Mr. Poese's history and characteristics make him a very low risk to re-offend. Significantly, he is married, and his wife remains supportive of him, even following his arrest. Notably, marriage has been found to have a significant effect on recidivism, consistent with other research which has found that marriage is associated with lower crime rates." Tina L. Freiburger & Brian M. Iannacchione, An Examination of the Effect of Imprisonment on Recidivism, 24 Crim. Just. Stud. 369, 377 (2011). The Commission's research also demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, see U.S. Sent'g Comm'n, Measuring Recidivism at 12-13 & Ex. 10; U.S. Sent'g Comm'n, Recidivism and the "First Offender" 8 (2004), as does substantial other research.[4] For sex offenders, cognitive behavioral therapy substantially reduces recidivism. U.S. Dep't of Justice, Center for Sex Offender Management, Understanding Treatment for Adults and Juveniles Who Have Committed Sex Offenses 10 (2006). As the Commission reports, recent studies show that "appropriate 'treatment interventions . . . are

associated with lower rates of recidivism—some of them very significant'" Child Pornography Report at 278 & n.31 (citing a project funded by the Department of Justice). Mr. Poese is educated, has a bright future in his employment -- if he is not incarcerated -- and has been willingly and consistently attending therapeutic treatment, all positively correlated with low recidivism. In short, Mr. Poese's long marriage, strong family support, education, employability and successful completion of weekly therapy strongly support the conclusion that he is most unlikely to re-offend. While a small minority of defendants convicted of possessing child pornography may again view child pornography and an even smaller minority may molest children, Mr. Poese is not one of them. The sentence should reflect the fact that Congress's contrary assumption is unfounded in this case. All of the evidence indicates that Mr. Poese will never view child pornography again. Supervised release with computer monitoring and other appropriate conditions is more than sufficient to ensure that he never does.

## F. The effects of the loss of his position at Camp Fitch

In assessing the appropriate sentence for Defendant, it is important to note that he has lost his job at Camp Fitch and is permanently barred from its premises. Given that he has been an integral member of this community – as a camper, volunteer, and then director – for decades, this punishment has been gut-wrenching, as attested to in the many, many letters of support he files with this Court. He has devoted endless hours toward the Camp; it has been his life focus and has provided a rich community of campers and staff who adore him. Losing his position has been heartbreaking, both to him, his family, others involved in the Camp, and even the Camp's Board of Directors that struggled with its decision to bar him from the facility. This loss is monumental and will punish him more than any term of incarceration could.

## G. Propriety of requested sentence

Courts have noted the comparatively lower culpability of defendants convicted of possessing child pornography (as opposed to distribution, production and actual sexual abuse). With respect to defendants convicted only of possession offenses, a number of courts have imposed sentences with minimal or no incarceration. See, e.g., D.M., 942 F.Supp.2d at 352; United States v. Autery, 555 F.3d 864, 867 (9th Cir.2009) (affirming non-Guidelines sentence of five years of probation and no period of incarceration for possession of child pornography); United States v. Stall, 581 F.3d 276, 277-78 (6th Cir.2009) (affirming non-Guidelines sentence of one day of incarceration followed by ten-year period of supervised release); United States v. Prisel, 316 Fed.Appx. 377, 378 (6th Cir.2008) (affirming non-Guidelines sentence of one day in prison followed by eighteen months of home confinement for possession of child pornography); United States v. Rowan, 530 F.3d 379, 380 (5th Cir.2008) (affirming non-Guidelines sentence of five years of probation and no period of incarceration for possession of child pornography); United States v. Polito, 215 Fed.Appx. 354, 355 (5th Cir.2007) (per curiam) (affirming non-Guidelines sentence of five years of probation with one year of house arrest for possession of child pornography); United States v. Crespo-Rios, No. 08-CR-208, 2015 WL 6394256, *1 (D.P.R., Oct. 19, 2015) (holding "that resentencing Defendant to the same sentence — that is, time served followed by a long period of supervised release — is justified in view of each of the sentencing factors outlined in 18 U.S.C. § 3553"); United States v. Mallatt, No. 13-CR-3005, 2013 WL 6196946, at *13 (D.Neb. Nov. 27, 2013) ("sentence of time served, followed by six years of supervision with special conditions including intensive treatment is adequate to fulfill the goals of sentencing in this case"); United States v. Diaz, 720 F.Supp.2d 1039, 1048 (E.D.Wis.2010) (imposing non-Guidelines sentence of six months of incarceration followed by

twelve years' supervised release); United States v. Meillier, 650 F.Supp.2d 887, 887 (D.Minn.2009) (imposing non-Guidelines sentence of one day of confinement followed by thirty years of supervised release); United States v. Boyden, No. 06-CR-20243, 2007 WL 1725402, at *10 (E.D.Mich. June 14, 2007) (imposing non-Guidelines sentence of one day of confinement followed by three years of supervised release, the first year of which to be served in a community correctional facility); see also United States v. Morace, 594 F.3d 340, 351 n. 10 (4th Cir.2010) (noting "that some district courts have begun sentencing defendants convicted of possessing child pornography to one day of incarceration followed by a term of supervised release").

Among the many, many letters of support he received, a number were from individuals who work closely with children and are trained to discern any type of inappropriate behavior: not a single person ever observed Defendant engaged in any untoward conduct toward any child or any other person, indicative that his possession of this single photo was wholly out of character for him and not suggestive of any deeper psycho-sexual issue that would pose a risk to any youth or others in his life.

Significantly, Mr. Poese's work at Camp Fitch did not involve direct contact with children, which might have been expected if he actually poses any threat to minors. Rather, he served in administrative positions dealing with finances, fundraising, human resources, systems, procedures, marketing, and project management. Neither his volunteer nor professional work included much direct interaction with children. If he did have deeper psycho-sexual issues warranting a more severe sentence, it would be unlikely that Mr. Poese would have chosen the roles he did at the Camp.

Accordingly, Defendant's requested sentence is in keeping with the sentences handed down by other courts for the same offense with similar offender characteristics. See United States v. Meysenburg, No. 08-CR-361, 2009 WL 2948554, at *8 (D.Neb. Sept. 11, 2009) ("Possession of pornography is the least serious of the crimes on the continuum of conduct — from possession to distribution to production to predatory abuse — that exploit children. One who possesses child pornography is considerably less culpable than one who produces or distributes the exploitative materials and a possessor is a marginal player in the overall child exploitation scheme.")

Finally, numerous friends and colleagues have expressed their support for him and demonstrated a commitment to help him find employment if here were not incarcerated. For example, Sam Boak, Company Owner, as well as a member of the YMCA Board of Trustees and the Camp Development Board, has averred that he would be willing to employ Defendant at his construction business, Boak & Sons, Inc., in Youngstown, Ohio. He explained that his company is comprised of over 150 union tradesmen who would benefit immensely from Mr. Poese's brilliant leadership. Mr. Boak expressed confidence that Defendant would be an absolute asset to this business and noted he (Mr. Boak) would be honored for Defendant to represent my company name. In other words, if given a sentence that does not require incarceration, Defendant is confident he can secure paying employment, thus providing for his family and his community.

## Conclusion

Thus, Mr. Poese respectfully requests that this Court impose the requested sentence of one day in custody, a period of home detention with electronic monitoring and work release privileges, monitoring of his computer and any other electronic devices, five years of supervised release, and that he undergo any further treatment deemed necessary by the Probation Officer in addition to the weekly treatment program Mr. Poese has already completed.

/s/Stephen E. Sebald
Stephen E. Sebald, Esquire
SEBALD & HACKWELDER
Pa. ID No. 87469
2503 West 26th Street
Erie, PA 16506
(814)833-1987

[1] See generally Martin H. Pritikin, Is Prison Increasing Crime, 2008 Wis. L. Rev. 1049, 1054-72 (cataloging eighteen criminogenic effects of incarceration); Lynne M. Vieraitis, Tomaslav V. Kovandzic, & Thomas B. Marvel, The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974- 2002, 6 Criminology & Pub. Pol'y 589, 614-16 (2007).
[2] See 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing increase to base offense level from 10 to 13); id. at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) (same); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley) (in support of directing additional increase in base offense level from 13 to 15); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing expanded reach of "distribution" enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (in support of Feeney Amendment, which included number-of-images enhancement); see also generally Child Pornography Prevention Act of 2006, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996); S. Rep. No. 108-2, at 3 (2003); S. Rep. No. 104-358, at 12-14 (1996); USSG app. C, amend. 592 (Nov. 1, 2000).
[3] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Seto.pdf
[4] Correctional Service Canada, Does Getting Married Reduce the Likelihood of Criminality, Forum on Corrections Research, Vol. 7, No. 2 (2005); Robert J. Sampson & John H. Laub, Crime and Deviance Over Life Course: The Salience of Adult Social Bonds, 55 Am. Soc. Rev. 609 (1990); Robert J. Sampson, John H. Laub & Christopher Winer, Does Marriage Reduce Crime? A Counterfactual Approach to Within-Individual Causal Effects, 44 Criminology 465, 497-500 (2006); Shirley R. Klein et al., Inmate Family Functioning, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002).

Steven L. Garrett, Ph.D.
151 Sycamore Drive
State College, PA 16801
(202) 494-7843
sxg185@psu.edu

The Honorable David S. Cercone
United States Courthouse
17 South Park Row
Erie, PA 16501

**Re: Matthew E. Poese**

Dear Judge Cercone:

I am a 70-year-old physicist who retired from my academic position as a Professor of Acoustics at Penn State exactly three years ago. At this stage in my life, I can honestly claim that my 40-year academic career was both professionally successful and personally rewarding. I make this claim humbly with the realization that my success was due, in very large part, to my ability to recognize scientific and engineering talent and to be a good judge of character. Those skills made it possible for me to identify graduate students who would not only be able to make significant contributions to my research efforts, but with whom I would benefit from spending the very large amounts of my time necessary to guided my students through their degree programs and thesis research, and who I would enjoy knowing throughout their professional careers.

I mention this because I have mentored over 70 graduate students through their masters or doctoral degrees, or both, starting with my first M.S. awarded in 1982 until my last Ph.D. in awarded in 2017. I supervised Matt's M.S. (1998) and Ph.D. (2004) degrees and would say that he is among the top three of my students, the other two being D. A. Brown (M.S. 1989, Ph.D. 1991) and R. W. M. Smith (M.S. 2000, Ph.D. 2008). Matt was the first student I hired when I arrived at Penn State in 1995, and unlike most graduate students, Matt and I continued to work together in the same laboratory for ten years **after** receiving his Ph.D., doing funded research at Penn State until he left in 2015 to work full-time as Associate Director and Director at Camp Fitch. I'd claim that other than his wife, Kelly, I know him better than any other adult on this planet. As his "academic father," I claim to know him better than his own parents.

As you might expect, for the 20-year duration of our professional collaboration, my work with Matt was the highlight of my career. At the end of this letter, I've listed the four patents, five journal publications, and 22 conference presentations that we co-authored during that time. Most of that effort was dedicated to development of an acoustical refrigeration technology that could provide cooling without using chemical refrigerants like CFC that destroy the Earth's protective ozone layer or HFC which are potent global-warming gases. That work is still ongoing. A significant milestone in the evolution of thermoacoustic refrigeration are the ice cream sales cabinet that we developed for Ben & Jerry's. One is shown in Fig. 1. We displayed the other at a European Union climate conference at EU headquarters in Brussel, Belgium.

**Figure 1** Photograph of Matt (*left*), me (*center*), and Bob Smith (*right*) at a Ben & Jerry's scoop shop in upper Manhattan in 2004, when we debuted the thermoacoustic ice cream sales cabinet that was cooled by the chiller at the right of the cabinet. That chiller was the subject of Matt's Ph.D. thesis, "An evolution of compact thermoacoustic refrigerator design." Ben & Jerry's created a flavor, named Sweet & Sonic, to commemorate the operation of an ice cream chiller that used no ozone-depleting CFCs or global-warming refrigerants.



Matt always saw science and technology as the path to improve the human condition. One of the most striking examples this commitment occurred on the day of the terrorist attack at the World Trade Center. I was returning from Europe on the day of that attack and my flight was grounded in Halifax for a week until flights into the US were allowed to resume. On that fateful day, Matt joined with two of his colleagues in the Acoustics Program and built an electronic apparatus into a backpack that included microphones and accelerometers that could be lowered into the rubble of the World Trade Center in an attempt to locate sounds or vibrations created by any survivors.[1] With no regard for their own safety, Matt, Tom, and Anthony drove to New York City and spent days making an acoustical search through the remains of the Twin Towers.

In addition to the altruistic focus of his scientific research activities, Matt showed an extraordinary dedication to the development of children and to exposing them to STEM topics. Ordinarily, a graduate student in science or engineering spends his or her summers working in the lab. Matt took his summers off to work at Camp Fitch. There were two reasons I approved of this unusual arrangement. The first was that Matt was the most effective researcher it was ever my pleasure to support. He could make much more progress in the laboratory, even when taking classes, than any other graduate student I'd advised. More importantly, I thought it was more beneficial for the several thousand youths who spent a week of their summer at Camp Fitch to be exposed to a real working professional laboratory scientist. Those are not the types of people who usually work at summer camps. The fact that Matt could act as a role model for so many impressionable young people was more valuable in the "greater scheme," at least in my estimation, than completing his graduate degree in less time.

Matt is both a gifted and dedicated teacher. This is not surprising given that both his parents were public school teachers, as was Kelly, his wife. What may be surprising is that I would frequently ask his advice

---

[1] T. B. Gabrielson, M. E. Poese, and A. A. Atchley, "Acoustic and vibration background noise in the collapsed structure of the World Trade Center," J. Acoust. Soc. Am. **113**(1), 45-48 (2003).

regarding how I might present a topic even though I had thirty years more teaching experience than him. By the time he left Penn State, he was teaching more classes that I was as a tenured full professor. He inherited a laboratory course that I created for our acoustics graduate students and he improved it! His student evaluations were among the highest in our department and the courses he taught for the Engineering Leadership Program at Penn State were brilliant in both their delivery and in the creative projects the students enrolled in his class would complete under his supervision.

Of course, I must close this character reference by confronting Matt's guilty plea to the charge of having possession of child pornography. This does not in any way fit with the Matt that I know so well. During his time at Penn State there were zero complaints about his behavior or comportment. Matt went to Fitch as a kid, worked there as a counselor, was married to Kelly at Fitch (I was there and it was the nicest and least pretentious wedding I've enjoyed), and when the position of Assistant Director became available, the Camp's trustees invited his application for that position. He and I have discussed the situation and I know that he is completely remorseful and feels terrible for the impact of his actions on his family and Camp Fitch.

I am sure that his crime is an aberration. Matt is the most productive person I've ever met. Look at the list of publications at the end of this letter. This productivity was not accidental. It was the result of extraordinary dedication and an uncanny ability to use his time efficiently and effectively. During our 20-year association, I will guarantee you that neither of us had the time or energy to lead a "secret life." I am sure you will get the same response from those who worked with him during his thirty years at Fitch and especially during the last five years while he had responsibility for setting the Camp's direction and attending to the administration of their staff and infrastructure.

In my view, the role of a Judge is to decide how to administer justice by taking into account all of the available information and using it to draw a logical conclusion that makes any punishment appropriate to the crime. I've known Matt for almost all of his adult life and he is a person who has selflessly contributed to the betterment of every community into which he's found himself. I have to admit that I am jealous of his ability to relate to people from all walks of life. Please grant Matthew a probationary sentence and encourage him to return to his family and to the good works that he has been doing over his entire adult life. There is nothing to be gained by his incarceration; he is not a threat to anyone.

Sincerely yours,

STEVEN L. GARRETT
Fellow of the Acoustical Society of America

**Donald Sniderman**
**26150 Village Lane**
**Beachwood, OH 44122**
**214-870-3173**
**donsniderman@gmail.com**

October 9, 2019

Honorable David Stewart Cercone
United States Courthouse
17 South Park Row
Erie, PA 16501

Re: Matthew Poese

Dear Judge Cercone,

My family first attended Family Camp at Camp Fitch in 1983. As the name implies, Family Camp gives families the opportunity to spend a week at Camp Fitch, sleeping outside in tent-like structures and availing themselves of the many activities offered. Members of our family have attended every Family Camp since.

After archery, crafts, boating on Lake Erie etc., Camp, in its wisdom, made baby sitters available in the evening to give adults a break and participate in adult activities. I can't pin point the exact year, but early on our baby sitter was Matt Poese.

We had met Matt in prior years and had requested him for the job. He had impressed us with his obvious love for camp and his ability to connect with kids and adults alike. Throughout the years he continued to be our baby sitter. We have five children, all of whom insisted that we hire Matt every year. We would return from bingo or square dancing to find the little kids sleeping and the older kids playing games with Matt or learning to play his guitar. As the years went by all of the kids attended regular summer camp sessions while Matt assumed increasingly important roles. In addition to lakefront director, Matt became a counselor, age group director, and village

director. He played a key role in my two oldest boys' development as they each, in turn, became counselors and village directors. Under Matt's mentoring, they learned leadership skills, patience and kindness, and a love for the outdoors that has helped them become fine fathers and successful adults.

I moved to Dallas Texas about 10 years ago and discontinued going to Family Camp. My children carried on the tradition and kept me apprised of Camp Fitch developments. I was delighted to hear that Matt had resigned his professorship at Penn State and had assumed the leadership role of Executive Director of Camp Fitch. He was accompanied by his wife Kelly who also assumed a leadership role, and his two children. He had fulfilled his often stated dream by doing so.

Last winter I moved back to Cleveland and accompanied my son Noah to The Camp Fitch Polar Bear Plunge, where a hole is cut in the ice and participants jump in. Created by Matt as a fundraiser, it has grown every year in popularity and money raised. Donations topped $200,000 dollars this year. The money is used to create scholarships for disadvantaged kids who could not otherwise afford camp.

I was astounded by the transformation that was happening at Camp. Matt had developed a comprehensive plan that included physical improvements and new personnel standards and organization. Most importantly, he developed new camper programs that increased camper enthusiasm and participation while addressing the many stresses that kids face today.

When I learned of Matt's arrest and the charges against him, I was saddened and dismayed. Shortly thereafter my son Noah and I attended a meeting at Camp. Matt had been fired and was prohibited from entering camp property. After the meeting we called Matt and met him at his home. Needless to say, it was a difficult meeting for all of us. We told Matt that we loved him and were there to support him however we could. He insisted on explaining his acceptance of his wrong doing and apologized for the pain it had caused Camp Fitch and everyone that was affected by his action. He was devastated by no longer having an association with Camp and fearful of how a potential incarceration would affect his family.

I visited him again a few weeks later while attending this year's Family Camp. The happy person that was always full of ideas that would make camp a more meaningful experience for children and staff presented a somber picture of contrition and despair. I came away from our meeting thinking that incarceration would remove Matt from a society that needs him to continue to serve us now more than ever. Given the chance, I'm sure that Matt will find a new way to contribute his many talents. With this in mind, I humbly ask that you take his incredible record of service into consideration and let him continue to positively affect the lives of many in the future as he has in the past.

Respectfully yours,
Donald Sniderman

Scott Osborne
182 Wedgewood Ave
Los Gatos, CA 95032
408 399-8477

Honorable David Stewart Cercone
US Courthouse
17 South Park Row
Erie, PA 16501

RE: Matthew Poese

Your Honor,

I am writing to You today to show my complete support for my cousin Matthew Poese. I've known Matt since he was born. We are a very tight family. We spent all of the holidays, birthdays, and many weekends together. To be completely honest, this letter has been very difficult for me. I don't understand how this crime happened and I probably never will. But, my difficulty is nothing compared to the stress the event has put on his wife and children. Yet, they are as tight as always. That speaks volumes to me, but doesn't surprise me. Matthew has ALWAYS been a wonderful, caring, loving person. He comes from great parents who gave him a loving home to live in. He and Kelly have done the same for their children.

I'm sure you have read, in other people's letters, about of the many achievements of Matt Poese. The man has always been a superstar. I'd like to focus on a few.

Matt was the valedictorian of his high school class. You can only achieve that type of recognition by showing not only that you are at the very highest level academically but also at the very highest level as a person. You must be doing things that stand out to the student body, the faculty, and the administration. He did those things while being a band member and volunteering in his community.

Matt progressed from high school to achieve degrees at The University of Cincinnati and then an engineering Doctorate at Penn State. Matt was so highly thought of that after graduating from Penn State they hired him to teach at the school! While teaching at Penn State our country was attached. Who can ever forget that horrible September day in 2001? Nobody! Being a person who has been helpful to others, Matt and some of his fellow engineers contacted authorities in NYC. They volunteered to use their acoustical technology to help find survivors. He and his fellow engineers packed up their equipment and headed into the fire, smoke, and toxic environment. They didn't do this for money, or fame, or notoriety. He and his friends did it because it was the right thing to do! Matt and his friends put themselves at risk for days trying to find people who may have survived that horrible event. What does that say about him? It again shows he's been the type of person who is at the very top of the spectrum of humanity. Giving, caring, and concern for others are the norm for him.

Lastly, I'd like to speak on his decision to take his "dream job" at the YMCA Camp Fitch. After a rewarding career at Penn State Matt decided to take on a new challenge as leader of

Camp Fitch. He had been a camper as a child, a summer volunteer camp counselor as a teen and adult, and now he was being asked to be the leader of the camp! After much discussion with his family he gave up teaching at Penn State and took on the new leadership role. It was financially stressing but He and his Family were in heaven! As leader of Fitch he used his charm, wit, and people skills to increase donations and volunteer-ship by 50%. With his tireless 24/7 work ethic he turned the camp into a huge success. People from all over Ohio, Pennsylvania, and New York were attending the camp and singing his praises. I was fortunate enough to visit one summer. People would come up to me and say what a blessing Matt had been for the camp. Again, Matt demonstrated his character by putting himself in a position that wasn't necessarily financially best for him but his work there was certainly helpful to others.

I will conclude by saying how horrible Matt feels about his action. He stated to me that he will do his very best to fix the wrong he has committed. I believe him! He has always done his best, and his best has always benefited others. I just wonder if we as a society will try to help Matt in his time of need as he has helped us throughout his lifetime.

Respectfully Yours,

Scott Osborne

Heather E. Bauman

6105 Southern Hills Ct.

Canfield, OH 44406

(330) 717-9309

heather.bauman@icloud.com

October 14, 2019

Honorable David Stewart Cercone

United States Courthouse

17 South Park Row

Erie, PA 16501

Re: Matthew Poese

Dear Judge Cercone,

I am writing you today as a friend of Matthew Poese. I have known Matthew Poese for the past 29 years, through my attendance at YMCA Camp Fitch in North Springfield, Pennsylvania. When I first met Matthew Poese, I was eight years old, and a camper at YMCA Camp Fitch. I attended summer camp for several years while Matthew Poese was a counselor, village director, and waterfront staff at Camp Fitch. I have also attended Camp Fitch with my family during family camp every summer for the past 29 years. Matthew Poese and I were on staff together at Camp Fitch during the summers of 1998-2001. During this length of time, I have known Matthew Poese to be an honest, humble, hard-working, dedicated, and trustworthy friend. I have seen first hand his dedication to the betterment of children and young adults through his volunteer work and career at both Penn State and YMCA Camp Fitch.

I am fully aware of the charges Matthew Poese has been accused of, and that he has plead guilty. It is my understanding that he is facing time in prison for the charges against him. While Matthew may not have intentionally committed a crime, he has taken full responsibility for his actions, and is deeply regretful of his actions. Due to his actions, he has already lost his employment at Camp Fitch, and is currently on house arrest, unable to interact with others outside of those that are willing and able to come to his home.

I first became aware of the charges against Matthew Poese from an email that was sent from the YMCA to all parents of children attending Camp Fitch this past summer of 2019. My daughter is eight and a half, and this was her second

summer attending Camp Fitch as a regular camper. Upon reading the email, I was in utter shock and disbelief as these charges do not coincide with the man I have known Matthew Poese to be. As stated earlier, in my interactions with Matthew Poese over the past 29 years, I have known him to be honest, humble, hard-working, dedicated, and trustworthy. Over the past 29 years, I have seen Matthew's unwavering dedication to the YMCA Camp Fitch as a seasonal leader, and most recently as the executive director for the past five years. During Matthew's earlier years at Camp Fitch, as a seasonal leader, I can remember going to Lake Erie and watching him teach kids how to waterski for the first time, go sailing for the first time, or just have fun swimming in the lake. His dedication to helping kids thrive in the outdoors in a safe environment where anyone is welcome has been unsurpassed by any other staff member at Camp Fitch. During his time at Penn State, he would spend any free time and weekends at Camp Fitch, where he would volunteer his time to help where ever he was needed. There were several summers that his family spent at Camp Fitch, and he was still employed by Penn State, therefore he would have limited time on the weekends to spend with his family, however, I would often see him doing odds and ends jobs around camp to help and get projects done, all unpaid. During this time, he helped establish the Polar Bear Plunge fundraiser, which has raised well over $500,000 to help send underprivileged children to Camp Fitch. He also helped start the Alumni Work Weekend, which is a group of former staff that volunteer their time to help improve Camp Fitch. Matthew's priority has always been children's safety, and this was fully demonstrated over the past five years that he was the executive director of Camp Fitch. Over the past five years Matthew was the director of Camp Fitch, I saw Camp Fitch thrive. The summer program grew exponentially, and Camp Fitch's overall revenue increased by 50% primarily through increased camper enrollment. When I applauded Matthew for this, he refused to take the credit, again speaking to his humble nature. While I was initially opposed to some of the changes, Matthew and I sat down to discuss his reasoning behind the changes, and one of the biggest reasons was the safety of the children and making sure that parents felt safe dropping off their children for a week at Camp Fitch. One of the significant improvements towards child safety was the design and construction of twelve new camper cabins. These cabins allowed there to be two counselors instead of one counselor per cabin. The cabins also had a bathroom so that children did not have to walk across an open field in the dark to go to the bathroom at nighttime. There were many other improvements made during Matthew's tenure as Camp Fitch's executive director. Some of these improvements include: design and construction of Friend Circle (amphitheater to allow summer campers to gather for opening and closing ceremonies each week); significant enhancements to the water treatment system; revitalization of Lake M'VIMA; a highly inclusive Master Site Planning process, Maker Center design, and front entrance redesign; implementation of a new thematic framework that revitalized the summer camp program; implementation of several major software platforms; website redesign and digital marketing effort. The impact he has made on Camp Fitch is indescribable, and the

void without him there will not be able to be filled. Matthew Poese has been a true visionary, and it is unfortunate that he will not be able to see his visions through due to the charges against him.

Matthew has accepted that what he has done was wrong and is deeply regretful for his actions. He wants to be able to move forward with his life. To do so, I believe what would be best is for Matthew to not be put into jail, as that would be a detriment to not only Matthew himself and his family, but society. As I hope you have seen from the examples above, Matthew has a kind heart, and is dedicated to serving his community in any capacity. He would be an asset to society, and it would be a detriment for him to be imprisoned for any length of time. I hope you will consider this letter when you make your decision on his sentencing.

Respectfully yours,

Heather E. Bauman

Heather E. Bauman

Kelly Poese
7945 Porter Road
Fairview, PA 16415
814-769-1304
kellypoese@gmail.com

October 11, 2019

Honorable David Stewart Cercone
United States Courthouse
17 South Park Row
Erie, PA 16501

Re: Matthew Poese

Dear Judge Cercone,

I am proud to introduce myself to you as Matt Poese's wife. I met Matt Poese in the Summer of 1989. At the time, my father was the acting Boys' Camp Director at Camp Fitch YMCA, and my family had spent every summer living at Fitch from the time I was about three years old. Matt applied to work as a counselor and was hired by my dad without hesitation. His strong academic performance in high school and long list of extracurricular activities made him the perfect candidate for the job. Matt continued to work at Fitch every summer after that, quickly falling in love with the strong sense of purpose and belonging that Fitch provided for him.

Matt and I became friends right off the bat and we hung out in the same group of people. We shared a love of music and both played guitar which is probably what sparked the initial flame of our relationship. Matt was a great listener and always very emotionally attentive. I was quickly enamored with his gentleness and intentionality. At that time in our lives, when we weren't together at camp, Matt and I were both students in different towns. I remember the physical pain that accompanied the goodbyes every August and the feeling that this relationship we shared was like nothing I had ever experienced before.

The majority of communication during our dating years was done through the United States Postal Service (before e-mail was even a thing). Reading his letters always cemented my interest in him. As a writer he was engaging, thought provoking, smart, and funny. As the years went by and our relationship progressed we confessed our love to each other via letter. (All of our correspondence is still in a box in our basement!) We shared trunks full of happy memories at camp summer after summer. In 1999, we were married in the outdoor chapel at Camp Fitch. This summer, 2 days after the FBI came to our house, marked 20 years of marriage.

There aren't words in the English language to describe how much I love Matt. He is my best friend, my inspiration, my coach, my support, my rock, my comfort... my everything. Having been such close friends for 30 years, we have certainly experienced hard times together; however, the events that have befallen our family in the last 6 months have definitely been the hardest.

If you had the opportunity to meet Matt in a different setting, I am sure that you would enjoy his company. After reading more about you I see that you actually have a lot in common -- children of your own, a distinguished career, and a strong personal commitment to a youth serving organization. Matt's personality is infectious and he is a great conversationalist. He is the hardest working person I've ever met and is always willing to push

himself and others to be the best. Matt has lived his life with integrity and is a committed public servant. He finds great satisfaction in helping others, solving problems, and making a difference. Since he was a teenager, he was committed, almost compulsively, to making Camp Fitch the premier Camp in the nation.

After finishing a Mechanical Engineering degree at the University of Cincinnati, Matt began a graduate program in Acoustics at Penn State University to pursue his Ph.D. Upon graduation, he became a faculty member at PSU, both as a research scientist and a professor. During all of those 15 years, Matt used the entirety of his vacation time to volunteer at Camp. In addition to our ten weeks of summer camp, we spent at least one weekend a month driving from State College to North Springfield to contribute at Camp either as fundraisers, organizers, event planners, program coordinators, and lots (and lots) of hours as good old fashioned grunt workers.

As the years progressed we made this trip with a dog, then eventually with two daughters and all of the support gear that a growing family needs for a summer at camp. During all of that time, Matt and I spoke often about a full time career at Fitch. Wouldn't it be great, we imagined, to really focus on what we felt like we were born to do? In 2008, Camp's Executive Director retired and Matt applied for the job. Sadly, the hiring committee hired an external applicant in an attempt to bring in some fresh ideas and new blood. Although we were disappointed, we tried to see the silver lining of that decision. In 2014, he applied again for an Associate Executive Director position and was hired -- our dream of working at Camp Fitch full time was finally becoming a reality!

In the 6 years that we worked at Camp together full time there was not a day that Matt didn't go to work. Even the day after Christmas, Matt was plowing the roads in the middle of a massive snowstorm so our Equestrian Team could feed the horses. Matt had a lifetime of ideas that he was now able to make a reality. He researched and implemented several software platforms that have streamlined work across all of our departments. He organized and grew a fundraising event that has generated over a half million dollars in the last 9 years to send kids to camp regardless of their family's financial situation. He cast a wide net with alumni, staff, and volunteers to include everyone in "the process." He revitalized our thematic framework and introduced new and important traditions that will last a lifetime. He oversaw the design and construction of 12 new camper cabins along with a master site plan to help guide us in our next chapter of growth. He negotiated with our YMCA association to raise salaries for everyone (but himself) to a livable wage. He redesigned our website and marketing materials to better narrate the treasures of friendship, achievement, and belonging that a Fitch experience provides to campers. These enhancements grew our summer enrollment numbers from 80% to 100% full (with waiting lists!) and in turn, increased Camp Fitch's total revenue by 50%. This renaissance at Fitch is the most growth in an equivalent time frame that it has ever experienced -- all driven by Matt's desire to innovate and commitment to execute.

Our family lives in Fairview during the school year and moves on site to Camp during the summer months. In June, the girls and I moved to our camp house as soon as they finished school, but Matt was so busy with projects and deadlines that he didn't have time to pack his belongings and move to camp. Consequently, we were not at home with him on June 18th when several armed FBI agents burst into our house at 6 am. When Matt told me about what had happened, my initial reaction was that of a Camp Director. *It's all going to be OK. We'll find a solution. Don't worry. Let's get more information.* Since he was banned from camp property, and I was living onsite at Fitch operating a demanding 400 camper resident camp program, our time together in the summer was very limited. I pieced his story together in small conversations when I went to visit and had a lot of time to think about things in between -- it felt not unlike our letter writing correspondence back in college. The news was shocking. Never in our 30 years together had I ever had suspicions or evidence by Matt of any form of power imbalance, sexual deviance, or hidden compulsions -- frankly, given his work habits, there would

never have been enough hours in the day for him to pursue such demons. He had millions of opportunities at both Penn State and certainly at Camp Fitch and never once was there a single moment of doubt.

In fact, during our time together at Fitch, Matt implemented a variety of strategies to *increase* child protection. He oversaw the transition the state of Pennsylvania made to require clearances for all employees and volunteers. He pushed on our organization to adopt a software package that helped employees and volunteers submit those clearances and access them during employment. He masterminded a cabin design process that doubled the amount of adult supervision for campers and provided private changing areas and en suite private bathrooms to minimize risk. He implemented a self reporting system for staff and volunteers to disclose moments when circumstances forced them to violate our foundational rules about child safety (being alone with a child, touching a camper without their consent, etc.) He visioned an entirely new supervision model that reduced opportunities for abuse and bullying. Matt is committed to keeping kids safe and "catching the bad guys." I can assure you that he is not among them.

Since June 18th, Matt and I have spent hundreds of hours in deep conversation about the charge to which he has pled guilty and what that means for our future. I have supported Matt on every step of this journey and our family has remained fiercely intact. Matt continues to live in our home with our two daughters and I am the sole financial provider, grocery shopper, kid taxi, etc. for our family while he has been on house arrest. For months, we have cried, and prayed, and hoped, and despaired, and dug deep, and leaned in, and... waited. I feel closer to Matt every day. I know that there is nothing that we can't endure together.

Since June 18th, there has been a dark cloud hanging over our home. Regret does not come anywhere close to describing the emotion that Matt battles every waking moment of every day. In our marriage, we have joked that it's not clear which he loves more -- our family or Camp Fitch. Losing his job at Fitch, his reputation with the community he's been fostering for his entire adult life, and the ability to even step foot on this hallowed ground has been unspeakably devastating. Most days Matt struggles to get out of bed. His natural gifts of deep thinking and careful consideration have become a curse. Thoughts just swirl in his head all day -- regrets, fears, uncertainties, and self-loathing rob him of his motivation and drive.

Our daughters have been so strong throughout this ordeal. Susannah (15) just started high school this year. She has been struggling with depression for the last year and a half and has spent hours with her therapist talking about her feelings and the pain that this unknown future has presented. She worries that without the academic support of her dad that she'll struggle with her honors curriculum -- especially in Science and Math. She worries about the potential consequences of having a father who is a felon and registered sex offender will have on her social life in these tenuous and intimidating teenage years. Maddy (11) and her dad have always been close. They share the same adventurous, people first, servant heart personality. She manages her emotions in different ways than her sister and loves to spend time with her dad. Her sadness has centered on the possibility of missing him in the day to day -- milestones like birthdays and Christmas (which for her happen to be on the same day), plays and concerts from which he may be absent.

I cannot imagine subjecting these kids to 37 months (or any months frankly) without their father. We need him in our lives and he needs us too. The house arrest that he has been under since August (and the self imposed house arrest since June 18th) have been difficult and dehumanizing, but we would gladly accept more of it if it meant that Matt could remain with us and not miss this next chapter of the girls' lives.

My own emotional health is hugely contingent on Matt's support. I have continued working at Camp Fitch since his termination for the sake of our children and as a means of financial support despite an avalanche of complicated emotions. Every day that I drive to work in the morning I feel like I'm betraying him -- leaving him

in bed to contemplate all that he has lost, nauseated by this label of sex offender that has been affixed to him like a scarlet letter despite the fact that he has no sexual affinity for children. It is a label that has already tainted the legacy that he left at Fitch and firmly closed doors for his future. Matt is the only person in the world who understands the complexities of my emotions. I need Matt in my life every day to help me find hope for tomorrow and give me the strength that I need to parent our vulnerable daughters. Our two broken hearts make one whole heart when we're together.

I know that there are brighter days ahead for all of us -- especially Matt. He has always been the guy who can make something out of nothing. His creative drive and relentless work ethic are a great asset to this world. It is my most desperate hope that you will see beyond this tragic mistake and allow him to begin again. Know that this new start will be emptier without Camp Fitch, but purposeful nonetheless.

One of the blessings of Matt's house arrest has been the time that we have been able to spend together. My parents, Matt's parents, friends from camp, our kids, have, in some combination, almost nightly dinners, game nights and opportunities to talk. We all support Matt with our whole hearts and intend to be with him as he faces this new life.

Matt will make us proud again -- of this I am certain. He will continue to change the world for the better and will embrace the opportunity to be mindful of his work/life balance for all of our sake. I humbly request that you give him the opportunity to get started on that journey without incarceration and let us start to put this behind him, and restore some sense of hope to our family.

Respectfully yours,

*Kelly S/Pm*

Kelly Poese

Kenneth Barton
4259 Brainard Road
Chagrin Falls, Ohio 44022
215-464-5251
suebartonink@gmail.com

October 31, 2019

Honorable David Stewart Cercone
United States Courthouse
17 South Park Row
Erie, PA 16501

Re: Matthew Poese

Dear Judge Cercone,

I am the father-in-law of Matthew Poese. I am the father of his wife Kelly and grandfather of their two daughters. I am also the Boys Camp Director Emeritus who first hired Matt Poese for a camp counselor position at Camp Fitch in 1989.

During my face to face interviews with potential staff, I learned to make accurate judgements about these young men. Matt was a volunteer counselor helping the middle school students from his community. This led him to apply for a paid summer counseling position. He was eager to continue at camp, and during our interview I realized what a bright student he was. Matt quickly moved up the ranks at camp through the high school and college years. Counselor, village director and waterfront staff were some of the positions that he excelled at.

Post college experience led him to graduate school at Penn State where he completed a PHD in engineering. He did applied research in his field and instructed graduate level classes. Even while on the faculty at Penn State Matt volunteered at Camp Fitch during weekends and whenever he could.

Matt headed up many important projects starting with our 100th year Centennial Celebration in 2014. Matt had the idea to host a ceremony at the site of the original Camp Fitch location near Lisbon, Ohio, have a campfire there, and transfer the "flame" to our present site on Lake Erie. This "flame" was carried by volunteers in a lantern across Ohio and up to the shores of Lake Erie. Like the Olympic torch, this lantern was passed from person to person and group to group on its way to Camp Fitch. These volunteers included alumni and even staff members from the Davis YMCA who were featured on a Youngstown, Ohio TV story. Ashes from this ceremonial fire were given to every participant in small glass vials.

Matt designed and engineered a new amphitheater for Camp Fitch which was named for a WWII veteran and Camp Alumnus , Howard "Howdy" Friend. "Friend Circle" was completely built by volunteers, camp alumni and campers. In Matt's typical inclusion of all people, the bricks were donated by a college friend of a family camper. This amphitheater seats 500 people and is used constantly for camp activities and ceremonies.. Everyone in the audience can view past the stage to see a campfire area and Lake Erie.

Matt has spearheaded a Master Plan development to grow Camp Fitch into the future. Two years of committee input and a skilled camp design architectural firm are producing change already. Twelve new cabins have been built, enhancements to the water treatment system, improvements to the "hobby farm", needed repairs to our inland Lake MVIMA. The master plan is in place and development of a "Maker Center" is soon to be built. Matt has been hands-on with all of these changes and has acted as project mananger to apply for permits, acquire needed materials, hire builders, widen camp paths and roads. Matt has used his technical skills to improve camp's web design and digital marketing of Camp Fitch, changes which have raised camper enrollment every year.

Matt knows now what he did was wrong. Losing all affiliation with Camp Fitch was like a death in the family. Matt has gone through similar stages of grief: isolation, self-anger, depression and finally acceptance and hope. His time under house arrest has given him a chance to evaluate who he was, who he is and who he hopes to be. He is closer to Kelly, Susannah and Maddy than he perhaps has ever been. He needs them and they need him. He has begun to contemplate the future. He has been offered several job opportunities from friends who know his abilities and good character. Matt has so much to give to so many. I hope he is allowed the chance to resume that giving now.

Respectfully yours,

Kenneth Barton

Kenneth Barton

*Emily A Heyl*
*274 Venango Trails*
*Mars, PA 16046*
*412-303-9569*
*Emilyheyl3@gmail.com*

October 28, 2019

Your Honor David Stewart Cercone,

I am writing to you for a character reference for Matthew Poese, who has a scheduled hearing on December 9, 2019.

I have known Matthew Poese for about 18 years (since I was a young 15 year old girl). My twin brother and I attended Summer Camp Fitch where I was a camper for 3 years, then I was on staff with Matthew for about 7 years. As you would know, Honor Judge Cerone, with you being on the board of Directors of the "Boys and Girls Club," these programs are critical for young people in order to reach their full potential as caring and responsible citizen. Camp Fitch has a similar mission statement as the "Boys and Girls Club," where Camp Fitch is anchored by caring, honesty, respect, responsibility and faith. I can respectfully say, that Matthew Poese was driven to implement these positive characteristics, not only in 100's of campers and staff each year, but he led by explain.

Matthew has such a passion and caring heart toward the staff and campers at Camp Fitch. Matthew was determined to make Camp Fitch a place where staff and campers would have a positive and memorable impact. For example, Matthew was the mastermind behind creating memorable Centennial Celebrations, revamping and constructing new camper cabins, made enhancements of the water treatment at camp, and lead a team of staff to grow Camp Fitch's revenue by 50%. Mathew helped start and lead the Annual "Polar Bear Plunge," which is an annual fundraiser for Children who face many roadblocks and financial stressors, and to help send these children to Camp Fitch for a week long experience. These are just a few of Matthews major contributions that showed his dedication and passion toward making Camp Fitch.

Matthew knows the impact that Summer Camp can have on a child. Matthew stood at the front line and lead an entire staff on making sure campers had access to a community of love and acceptance.

Honor Judge Cerone, I am confident that you will be receiving many letters like mine that only touch on Matthew Poese's great character. I can only hope you see the major impact that Matthew Poese has had on so many lives, including my own.

Sincerely,

Emily A Heyl

# DOWD TREATMENT CENTER
## GEORGE J. DOWD, M.S., L.P.C., C.A.A.D.C., C.C.D.P. DIPLOMATE
### 2209 WEST GRANDVIEW BOULEVARD – SUITE A
### ERIE, PENNSYLVANIA 16506

TELEPHONE: (814) 450-7293          GDOWDLPC@AOL.COM          FAX: (814) 864-2371

December 4, 2019

Attorney Stephen Sebald
RE: Matthew E. Poese
D.O.B.: 10/12/1971

### COMPREHENSIVE EVALUATION & TREATMENT SUMMARY

The patient is a 48-year-old, married, Caucasian male. The patient has been married for twenty-one years. He reports a good marriage. His wife also reports their marriage is strong. The patient has a PhD in engineering from Penn State University. The patient was employed for several years in the engineering field. Most recently, he was the camp director of Camp Fitch, a local YMCA camp in the Erie County area of Pennsylvania. He was employed there full-time as the director of the camp for the past four years. He had no job jeopardy. He had strong work performance at the camp.

He currently resides with his wife and children. He reports that his wife is a senior program director at Camp Fitch, working along with him. He has a solid relationship with his children. He reports that he has served the community for most of his life through his endeavors at the camp.

He reports that he grew up in Courtland, OH. He attended high school in the Youngsville area. He reports that his father was a physics teacher and his mother was a gymnastics teacher. His father was his role model. His father struggled with depression. The patient reports his father was emotionally abusive and critical during his childhood. He reports that he had a better relationship with his mother growing up, despite her being very critical as well and having high expectations. He reports that his mother's mother died in an auto accident when his mother was 17 years old. This led to a lot of his mother's emotional pain.

He reports that he learned to bury his feelings from both of his parents. There is an insignificant family history for alcohol or drug issues. He denies abusing alcohol or drugs.

He reports that he has been depressed since the fourth grade. He reports that he didn't have any friends growing up. He reports that he was a very bright young man who liked to read. He referred to himself as a nerd.

He reports that he has an eleven-year-old daughter and a fourteen-year-old daughter. His one daughter is depressed and overweight. She also suffers from self-esteem issues. He indicates that she is very bright and theatrical.

He reports that his wife has been his only sexual partner throughout his life. She is three years younger than him. He reports that his wife is overweight, which is a concern for both of them.

He indicates that he began viewing pornography in high school. He indicates that there was masturbation at that time as well. He reports that he lacked confidence and had no intention of pursuing a relationship at that point in time. He indicates that he would use pornography as a way of escaping. He reports that he would feel guilty about viewing the pornography, but it was a way of escaping. It was an illicit thrill for him.

He reports that the pornography he viewed over time was adult pornography but he had a curiosity that ultimately led him to the child pornography. He indicates that he has never manufactured, distributed or engaged in other illegal behaviors associated with it. He reports that he read an article about Bing, Microsoft's search engine, and how one could access pornography with it. He began looking at it through intellectual curiosity using that mechanism.

On 06/18/2019, he reports that the FBI came to search his house. They took a cell phone and server. They found images of child pornography on the Wi-Fi associated with his house from January and February 2019. That is what led to his current situation.

He reports that he has never had any kind of unhealthy, illicit or sexual misconduct with a child. He reports that he is not attracted to children. He reports that it was mainly curiosity that led him to these images after reading the article about the Bing search engine. He indicates that he did not understand the gravity of his situation. Since he did not manufacture or distribute the child pornography, he thought what he was doing was rather harmless and wouldn't really register on anyone's scale or radar to cause any difficulty for him.

He reiterated the fact that he does not have any sexual desire for children and that looking at pornography was a way of coping with his workaholic behavior at the camp. He reports that it

was a way of escaping from reality and he did not feel at that point in time that he was hurting anyone.

He immediately engaged in treatment on 06/19/2019. He has been engaged in the individual outpatient psychotherapy level of care. He has been attending weekly and biweekly sessions since that point in time. He does not meet the criteria for any type of violent sexual predator. He does have a healthy sexual relationship with his wife. He does not engage in any type of other aberrant sexual behaviors, such as voyeurism or exposing himself to others. He does not have any type of fantasies about rape or sexual activity with children.

He reports that he considered himself to be a good person. He dedicated his whole life to his work at Camp Fitch, trying to serve and improve his community. This was the first and only issue he has ever had with the law. He is devastated by it. He feels that he has tried to be a good husband, father and servant to the community. He feels that his workaholic behavior that he was consumed with led him to the pornography and the Bing search engine, which ultimately led him to the pornography of children.

He is deeply remorseful for the choices that he made. He is taking full responsibility for his actions. He feels that he and his family's lives have been devastated by his behavior. He indicates true remorse.

He does not have any involvement with pornography at this point in time. He was able to discontinue all of this behavior completely. He doesn't report any obsessions or compulsions around this activity. He has been very depressed since this legal issue and the fact that he is no longer able to work at Camp Fitch. While he was at Camp Fitch, he reports that his duties were more administrative and that he really didn't have any access to children.

He reports that he has never assaulted a child nor would he ever. He feels very contrite over his behavior. He is motivated to continue in outpatient psychotherapy as he feels this has been beneficial in addressing his mood stability, insight into his behavior and making positive changes in his behavior.

Throughout the course of therapy, he has been very open and forthcoming. His wife and daughter have attended a session regarding his situation. They are very supportive and understanding. They are also very fearful of the consequences of his behavior. At this point in time, I do not see him as a risk for relapsing back into this type of behavior. He has responded

favorably to treatment. His therapeutic involvement has been good. He has been very open and honest with the process. I believe that his chances of reoffending are unlikely.

At this point in time, I do see him as a very positive candidate for rehabilitation. He is willing to accept any sentence that the court provides for him. He is looking toward the future and rebuilding his life in a much healthier manner. He has a very positive attitude about the future. He is a very intelligent individual and just wants to provide for his wife and family. If you would like to discuss this case further, please do not hesitate to contact me.

Respectfully,

GEORGE J. DOWD, M.S., L.P.C., C.A.A.D.C., C.C.D.P. DIPLOMATE

Brian J. Stark, D.O.
Primary Care Partners
7287 West Ridge Rd.
Fairview, PA 16415
Starkbj@upmc.edu

November 10, 2019

Honorable David Stewart Cercone
United States Courthouse
17 S. Park Row
Erie, PA 16501

Re: Matthew Poese

Dear Judge Cercone,

Matt Poese saved my life. And my wife's. Literally.

Further, he has saved and contributed to many people's lives as an educator, volunteer, philanthropist, and as the director of YMCA's Camp Fitch. Figuratively, but importantly and invaluably nonetheless.

I met Matt in 2004 at Camp Fitch where my wife and I, along with our five children, attended Family Camp each summer. It was clear to us that Matt was a decent, honest, and thoughtful person who got along with everyone, and embodied the YMCA **mission** to "put Christian principles into practice through programs that build healthy spirit, mind and body for all."

Matt was (and still is) a fantastic role model to children and adults alike, and was (and still is) clearly a dedicated family man, attentive always to the needs of his wife and daughters. All the dads at Family Camp respected (and still respect) him and the way he treated everyone with equality and kindness. And he was (and still is) tireless in his ability and willingness to help others physically, emotionally or spiritually.

That same unselfishness and willingness to help others lead him to risk his own life in 2008 when my wife and I were sailing off the shores of Camp Fitch. A sudden violent storm overwhelmed us and our small sailboat, rendering the boat inoperable and my wife and I injured and exhausted, and fighting for our lives. As we drifted out into Lake Erie in gale-force winds, we could see everyone scrambling to take cover inside the nearby dining hall, except for Matt! Despite the obvious risk, he jumped into a small boat and battled the waves and weather to rescue us.

While certainly his actions were heroic, to him, it was just "doing what's right", a principle by which Matt has lived his life. A single, isolated and nonviolent crime does not change that about this man; nor does it change the opinions of the many people whose lives he has touched (or saved!).

However, as physicians (my wife is a pediatrician, I a family doctor), we are very well-aware of the scourge and abomination that is child pornography. It is NOT, as you know, a victimless crime. Very sick people—criminals—can and do great harm to individuals and our society in this regard. Matt is also completely aware of this.

I know, because I also happen to be Matt's personal physician. I can (with his permission) assure you—and the public—that he has absolutely no evidence of pedophilia or any other sexual or behavioral aberrancy or disorder. In fact, he is a remarkably healthy person physically, mentally, and emotionally.

Your Honor, Matt is a normal, good person who made a single mistake. He has great remorse for his action. He has taken appropriate steps (including personal counseling and complete voluntary medical and psychological evaluation by me and others) to make sure this never happens again.

Further, Matt has already suffered enough. He has lost his job and the ability to fulfill his lifelong commitment to helping create better lives for children. Along with his wife Kelly and their daughters Madelyn and Susannah, he has suffered inordinate shame, rejection, and stress. (Ironically, a man who never prejudged another, has been maliciously judged by some). Even in this time, so culturally sensitive to these issues, to incarcerate him might be cruel; and most definitely will be a catastrophic loss to his family. And to society.

Judge Cercone, Matthew Poese's true character is manifest not in this one criminal mistake, but in the good he has done and the good-will he has created all his life. Please consider allowing him to continue to do so. Our world needs people like him. And some of us wouldn't be here without him!

If I may be of any further assistance, I can be reached daily at my office at 877-2360. I am honored to help this good man, and his supportive family, in any way I can.

Sincerely,
Brian Stark

**Tricia L. Busby, Ph.D.**
**Clinical Psychologist Lic#PSY26570**
**P.O. Box 108**
**Coalinga, CA 93210**

November 10, 2019

Honorable David Stewart Cercone
United States Courthouse
17 South Park Row
Erie, PA 16501

Re: Matt Poese

Dear Judge Cercone,

I am writing this letter on behalf of Mr. Poese. First though, I would like to briefly summarize my background. I am a clinical psychologist that specializes in Forensics in California with twelve years of experience working with offenders convicted of sexual crimes. I have written several forensic reports to the court and for the last three and a half years, have supervised forensic psychologists who write forensic reports to the court involving California's Sexually Violent Predators and Mentally Disordered Offenders. Thus, I have extensive experience in research regarding sexual offenders as well as sexual and violence risk.

I became aware of Mr. Poese's situation through a colleague and thought I could be of some assistance in providing general information about research related to a person's risk of sexual reoffense or future sexual offense risk. The sexual offense research also has found protective factors that lower a person's risk for reoffense for persons charged and or convicted of a contact sex offense or a possession of child pornography offense. A protective factor is any characteristic of a person, his/her environment or situation which reduces the risk for future violent or sexually inappropriate behavior.

The current sentencing laws are based on the premise that someone found in possession of child pornography equates to someone who has had a previous contact sexual offense or that possession of child pornography will lead to a contact sexual offense. The research does not support this notion. The research indicates that less than one percent had a previous contact sex offense and only three percent go on to commit a violent or sexual offense in the future[1]. Another study that followed person's convicted of child pornography possession from one and a half to six years found that only two percent were convicted of a contact sexual offense in that time period and only three percent were convicted of possession of child pornography again[2].

Mr. Poese does not have a previous criminal history and has been, by all accounts an upstanding citizen and pillar of his community for many years. Research has found that those higher in antisociality are at greater risk of committing a future sexual offense[3]. Mr. Poese possesses several

1

protective factors that reduces his risk of any future sexual offense$_4$. Intelligence, a stable work and financial history all have been found to be protective factors. He possesses a Doctorate degree in engineering and physics, with a specialty in acoustics. He has been an administrator at Camp Fitch for several years without any complaints. He was in a role at the facility that did not have direct access to children. Typically, a sexual offender against children would attempt to assume a role with direct contact with children. He has also taught graduate courses at a university for several years without any complaints. He is also financially responsible and stable and has already been contacted about future employment offers.

Secure attachment in childhood and a close intimate relationship with an adult have both been found to be a protective factors that reduce risk for recidivism. Mr. Poese has had a close emotional relationship with his parents and denied suffering any emotional, physical or sexual abuse as a child. Mr. Poese has a close and stable relationship with his wife of about twenty years. His wife and his two daughters have been very supportive throughout this situation. He indicated his wife and his family are now closer than they have ever been. Thus, he demonstrates a capacity for relationship stability. He also only associates with positive influences and described having accrued approximately 150 letters of support on his behalf from family, friends and community members.

Mr. Poese does not have a prior history of substance use or mental health treatment. He has a positive history of a stable life, without evidence of impulsivity, or poor cognitive problem solving. Both of which, are factors that lower risk for a future sexual offense.

Mr. Poese does not have sexual interest in children and reported that it was a story about the ability to access child pornography through a Bing on-line search that peaked his curiosity (his curiosity was out of disbelief that it was possible to access child pornography through a Bing search). He does not possess emotional identification with children either. As was previously indicated his position at the Camp was administrative with minimal, to no direct contact with children.

When speaking to Mr. Poese, he demonstrated empathy for others, especially children and understood why there is concern given his position and role in the Camp Fitch organization and teaching position. He demonstrated concern for his family as well as the larger community and how this situation has impacted the community. Mr. Poese's empathy for others even extends to his work as an engineer because he is a big proponent of human centered design. The ability to empathize with others also lowers a person's risk for committing a future sexual offense.

Finally, the ability to cooperate with supervision and obtaining professional care are considered protective factors and lower risk for sexual offense. Mr. Poese has not had any issues or violations since he has been on house arrest. He has also sought professional help from a psychologist and continues to see the psychologist twice a month. He is motivated for treatment and indicated it has been helpful to self-reflect.

2

**Tricia L. Busby, Ph.D.**
**Clinical Psychologist Lic#PSY26570**
**P.O. Box 108**
**Coalinga, CA 93210**

In summary Mr. Poese possesses many protective factors that lower his risk for committing a sexual offense in the future. He also possesses many positive attributes that allow him to continue making contributions to his family and the community. He as a long history of stability in all of his life domains. Based on research he is at very low risk of committing a sexual offense in the future and has not demonstrated any problematic behaviors since being on house arrest. A responsible judicial system adhering to the risk principle of effective corrections, would suggest that legal, policy and clinical responses to child pornography possession offenders, like Mr. Poese, should be proportional to their risk. Given Mr. Poese's very low level of future sexual offense risk, supervised probation seems to be the most appropriate legal response.

Thank you for this opportunity to provide a professionally based, research perspective for Mr. Poese.

Respectfully,

Tricia Busby, Ph.D.